**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>  Plaintiffs,<br><br>  v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>  Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**MEMORANDUM OPINION** |

**COOPER, District Judge**

The Plaintiffs, Joan Mullin, individually and as administratrix

of the estate of Robert Mullin, her son, (hereinafter "Plaintiffs")

bring this action against the following individual defendants in

their "personal, individual and professional capacities" who

represent the Department of Corrections of the State of New Jersey,

South Woods State Prison, and Central Reception & Assignment

Facility: Administrator Karen Balicki (hereinafter "Balicki");

Director Robert Patterson (hereinafter "Patterson"); and Director

Marie Dunlap-Pryce (hereinafter "Dunlap-Pryce").  (See dkt. entry

no. 102, 2nd Am. Compl. (hereinafter "Compl.").)[1]  Plaintiffs

---

[1] Before the Court is Plaintiffs' Second Amended Complaint.
(See dkt. entry no. 129, 3-8-13 Order at 1; dkt. entry no. 143, 5-
14-13 Order at 1 n.1.)  References to "Complaint" hereinafter refer
to this Second Amended Complaint.

further bring this action against the following individuals in their "personal, individual and professional capacities": Jane Byrd, L.P.N. (hereinafter "Byrd"); Erin Marusky, R.N. (hereinafter "Marusky"); Officer Dimler (hereinafter "Dimler"); and Beatrice Teel, R.N. (hereinafter "Teel"). (See id.) Plaintiffs also name as defendants Kintock Group and Mercer County. (See id.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011. (See dkt. entry no. 15, Stip. of Dismissal as to Mercer County.) Plaintiffs also agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013. (See dkt. entry no. 139, 5-2-13 Order.)

Before the Court are the separate motions by Byrd to dismiss the claims asserted against her and by Balicki, Patterson, Dunlap-Pryce, Dimler, and Teel (hereinafter "DOC Defendants") to dismiss the claims asserted against them for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c). (See dkt. entry no. 144, Byrd's Mot. to Dismiss; dkt. entry no.

145, DOC Defs.' Mot. to Dismiss.)[2]  For the reasons that follow,
the Court will deny the part of the motion to dismiss concerning
the individual-capacity, constitutional claims against Byrd, and
the Court will grant the remainder of the separate motions to
dismiss in their entirety.

## I.  ALLEGATIONS IN THE COMPLAINT

Plaintiffs' claims are based on the suicide of Robert Mullin
(hereinafter "the decedent") while incarcerated in the State of New
Jersey.  Specifically, Plaintiffs allege that the decedent was
incarcerated for about six to eight years through January 17, 2009,

---

[2] Byrd and Dimler filed answers on October 24, 2012 and April
9, 2013 respectively.  (See dkt. entry no. 108, Byrd Answer; dkt.
entry no. 134, Dimler Answer.)  Both preserved the grounds for
dismissal at issue before the Court by raising failure to state a
claim as an affirmative defense in their answers.  With respect to
these two defendants, the motions pending are Rule 12(c) motions
for judgment on the pleadings for failure to state a claim since
these defendants have filed responsive pleadings.  See Turbe v.
Gov't of V.I., 938 F.2d 427, 428 (3d Cir. 1991) (stating that
Rule 12(b)(6) motions must be filed before a responsive
pleading, but that "[a] Rule 12(c) motion for judgment on the
pleadings may be filed after the pleadings are closed. . . .
Rule 12(h)(2) provides that a defense of failure to state a
claim upon which relief can be granted may also be made by a
motion for judgment on the pleadings."); Fed.R.Civ.P. 12(h)(2).
As to the remaining defendants who have not filed responsive
pleadings, the pending requests for relief are pursuant to Rule
12(b)(6) for failure to state a claim upon which relief may be
granted.  Counsel for Dimler described the nature of the request
for all the DOC Defendants as being pursuant to Rule 12(b)(6).
This was in error, as the filing of Dimler's answer renders that
request to be pursuant to Rule 12(c).  See Turbe, 938 F.2d at 428.
Byrd's motion was properly labeled as a Rule 12(c) motion.  Because
the standard for a Rule 12(b)(6) motion applies to both the Rule
12(c) and the Rule 12(b)(6) motions pending, see id., the Court
will hereinafter address them by reference to Rule 12(b)(6).

the date of his death.  (Compl. at ¶ 11.)  In May of 2008, he was
transferred from prison to a halfway house operated and managed by
The Kintock Group (hereinafter "Kintock").  (Id. at ¶ 12.)  The
decedent was to be released from Kintock around April to June of
2009 following his completion of the therapy, work studies, and
rehabilitative services.  (Id. at ¶ 13.)  However, while residing
at Kintock, the decedent had been fired from his job.  (Id. at ¶
23.)

On January 15, 2009, while at Kintock, the decedent exhibited
a deterioration in his mental status and became aggressive.  (Id.
at ¶ 14.)  Illegal substances, including cocaine and opiates, were
found in his possession.  (Id. at ¶ 15.)  Also, in the presence of
a Kintock caseworker, the decedent swallowed a handful of pills
that he identified as medication for depression.  (Id. at ¶ 16.)

The decedent was subsequently transferred to South Woods State
Prison, where he was medically evaluated, and he tested positive
for opiates and cocaine.  (Id. at ¶¶ 17-18.)   On January 16, 2009,
he was transferred to the Central Reception & Assignment Facility
(hereinafter "CRAF"), "under the custodial care, supervision,
management and control" of Balicki, Patterson, and Dunlap-Pryce
(hereinafter "Supervisory Defendants").  (Id. at ¶ 18.)  Plaintiffs
further allege that between January 15 and 17, 2009, the decedent
"also was treated by and was under the custodial care, supervision,

4

management, and control of the Trenton Psychiatric Hospital," and its employees and staff. (Id. at ¶ 19.)

Plaintiffs allege that Kintock's file on the decedent indicated that he had an extensive drug history and a high risk of abusing drugs and alcohol. (Id. at ¶¶ 21-22.) Also, Plaintiffs allege that the decedent had a history of mental illness and suicide attempts. (Id. at ¶¶ 24, 40.) At various points from 2005 until the time of his death, the decedent had been hospitalized for mental illness, had used medication for his psychiatric conditions, and had considered or attempted suicide. (Id. at ¶¶ 40-41, 43-49.) The Complaint alleges that this was reflected in various medical records and intake forms; however, with the exception of the records from Kintock, the Complaint does not allege that the defendants had actual knowledge of these records or the information contained therein in January of 2009. (See, e.g., id. at ¶¶ 40-41, 43-48.)

On January 14, 2009, three days before his death, the decedent's medical records reflect that he "was seen at South Woods State Prison, following a transfer from Kintock to Detention/ECU, and the diagnosis of 'mood disorder,' a family history of suicide, and a history of being a suicide risk." (Id. at ¶ 49.) The Complaint does not indicate whether the particular defendants in

this matter were aware of the January 14, 2009 records or their content.

According to the Complaint, Byrd and Teel, as agents of the Supervisory Defendants, examined and evaluated the decedent on January 16, 2009. (Id. at ¶ 39.) Byrd performed a nursing intake on this date, and the decedent allegedly responded in the affirmative to the following questions: (1) "have you ever been hospitalized or treated for psychiatric illness"; and (2) "have you ever considered or attempted suicide." (Id. at ¶ 50.) The decedent's medical records from this same date included a "diagnosis of 'mood disorder,' a family history of suicide, and a history of being a suicide risk." (Id.) On January 16, 2009 at CRAF or South Woods State Prison, Byrd cleared the decedent medically for placement in the general prison population. (Id. at ¶¶ 51, 56.)

At approximately 4:23 AM on January 17, 2009, Dimler, who was allegedly the corrections officer responsible for caring for and treating the decedent, found the decedent unresponsive after the decedent had hung himself with what limited records indicate was a self-made noose from a bed sheet. (Id. at ¶¶ 25-26.) After this discovery, Teel was summoned, an unnamed officer or medical provider performed CPR, and the decedent was pronounced dead at 4:49 AM. (Id. at ¶¶ 30-31, 57.)

The Complaint asserts that Kintock failed to advise or notify Byrd, Teel, and Dimler about the decedent's mental-health and substance-abuse issues. (Id. at ¶ 56.) The Complaint further alleges that Dimler and Teel "knew or should have known" of the decedent's history of attempted suicide, mental illness, and substance abuse from the transfer records from Kintock. (Id. at ¶¶ 27, 33.) The Complaint alleges that they failed to "review, evaluate, or follow" transfer records from Kintock in determining what level of care to provide to the decedent, including treatment for his intoxication and one-on-one supervision. (Id. at ¶ 36.) The Complaint asserts that Byrd and Teel failed to evaluate the decedent for intoxication, as was required by policy and procedure. (Id. at ¶ 53.) According to the Complaint, had these defendants properly evaluated the decedent and reviewed his medical records, the decedent "would have been transferred to the infirmary and/or been placed under constant supervision without the ability to harm himself." (Id. at ¶ 54.) Moreover, Dimler and Teel purportedly "knew that policy and procedure required direct and constant supervision and monitoring, and yet failed to abide by said policy and procedure, evidencing a gross indifference" to the decedent's welfare. (Id. at ¶¶ 28, 34.) Specifically, both permitted the decedent to be in a cell with materials including bed sheets that could be used to inflict self-harm. (Id. at ¶¶ 29, 36.)

According to the Complaint, the decedent's history of suicide attempts, mental-health issues, and recent drug abuse were known or should have been known to Dimler, Teel, Byrd, Kintock, and the Supervisory Defendants.  (Id. at ¶¶ 60-64.)  However, the individual defendants, including Teel and Dimler, failed to provide adequate supervision to the decedent.  (Id. at ¶¶ 60-61.)  The Complaint alleges that the failures of these individual defendants "were the direct and proximate cause of the self-harm and suicide by" the decedent.  (Id. at ¶ 55.)

The Complaint also asserts that the Supervisory Defendants failed to follow their own policy and procedure requiring them to familiarize themselves with an inmate's transfer records and failed to ensure that the decedent was properly treated and supervised for drug addiction and suicide risk.  (Id. at ¶¶ 64-65.)  The Complaint also claims that these Supervisory Defendants failed to enact and enforce procedures and policies that required their staff to review transfer records or that provided for the treatment of intoxication, and these failures foreseeably led to the decedent's suicide.  (Id. at ¶ 66.)

Plaintiffs initially brought this action on January 14, 2011; however, the complaint at issue before the Court is the Second Amended Complaint, which was filed September 21, 2012.  The Complaint asserts six counts pursuant to 42 U.S.C. § 1983

(hereinafter "section 1983") and the New Jersey Civil Rights Act

(hereinafter "NJCRA"), N.J.S.A. 10:6-1 et seq.:

(1)  deprivation of the decedent's constitutional rights
     under the Fourteenth, First, Fourth, Fifth, and Sixth
     Amendments of the United States Constitution (id. at ¶¶ 73-
     94);

(2)  deprivation of the decedent's constitutional rights
     under the New Jersey Constitution, Article 12, the right to
     be free from cruel and unusual punishment, and Article 1,
     the right to due process (id. at ¶¶ 95-104);

(3)  negligent hiring, training and supervision of employees
     and agents (id. at ¶¶ 105-18);

(4)  intentional and negligent infliction of emotional
     distress (id. at ¶¶ 119-34);

(5)  abuse of process by Supervisory Defendants and Kintock
     (id. at ¶¶ 135-44); and

(6)  medical malpractice by, inter alia, Byrd and Teel (id.
     at ¶¶ 145-62).

Plaintiff seeks compensatory and punitive damages, funeral

expenses, interest, attorneys' fees, and litigation costs.

## II.  GOVERNING STANDARD

When considering a motion to dismiss for failure to state a

claim, the court must accept the facts pleaded in the complaint as

true and draw all inferences in favor of the plaintiff.  Phillips

v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  "[O]nly a

complaint that states a plausible claim for relief survives a

motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

"A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. This plausibility standard is not a "probability requirement." The standard merely requires "more than a sheer possibility that the defendant has acted unlawfully." Id.; see also Phillips, 515 F.3d at 234.

"[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Legal conclusions "must be supported by factual allegations." Id. at 679.

A civil-rights complaint must "'contain a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs.'" Freedman v. City of Allentown, 853 F.2d 1111, 1114 (3d Cir. 1988) (quoting Ross v. Meagan, 638 F.2d 646, 650 (3d Cir. 1981)).[3] The court must look past any conclusory allegations regarding the willfulness of the defendants' conduct or the defendants' reckless disregard of the

---

[3] Plaintiffs assert civil-rights claims under section 1983 and under the NJCRA, the state counterpart of section 1983 for violation of rights secured under New Jersey's Constitution. See Green v. Corzine, No. 09-1600, 2011 WL 735719, at *7 (D.N.J. Feb. 22, 2011). The "NJCRA is generally interpreted to be coextensive with its federal counterpart." Id. Unless otherwise stated, the analysis and determinations with respect to the section 1983 claims apply equally to claims under the NJCRA.

rights of the victim; the court will focus on "the factual scenario itself to examine whether the conduct alleged, viewed most favorably to plaintiffs, is reasonably susceptible to falling within the conclusions alleged." Id. at 1115.

In situations in which more specific allegations may demonstrate that the conduct at issue falls within section 1983's ambit, district courts are required to permit amendment to the complaint. Id. at 1114. "Furthermore, when the lack of factual specificity is fairly attributable to defendants' control of required information, we have permitted the action to proceed to a reasonable amount of discovery to help [plaintiff] make the necessary showing to prove her case." Id. (internal quotation marks and citation omitted).

### III. ANALYSIS

### A. Official-Capacity Claims[4]

Balicki, Patterson, Dunlap-Pryce, Dimler, Teel, and Byrd (hereinafter "Movants") seek dismissal of the official-capacity claims (both state and federal) asserted against them based on state-sovereign immunity under the Eleventh Amendment. The Eleventh Amendment states, "The judicial power of the United States

---

[4] Plaintiffs have named several of the individual defendants in their "personal, individual, and professional capacities." Based on the nomenclature in our federal jurisprudence, the Court construes this to mean that the individuals are sued in their individual and official capacities.

11

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. With a few exceptions, the Eleventh Amendment prevents a state entity from being a defendant in a lawsuit. This state-sovereign immunity extends to state officials who are sued for money damages in their official capacities. See, e.g., Kentucky v. Graham, 473 U.S. 159, 169-70 (1985). However, Congress can abrogate state-sovereign immunity through an unequivocal expression, or a state can waive its own immunity to suit. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999).

The parties do not dispute that Movants are state officials, and thus, when sued in their official capacities, the Eleventh Amendment issues arise. In this case, the Complaint seeks monetary damages as opposed to prospective relief against these state officials sued in their official capacities. Congress did not abrogate state-sovereign immunity in section 1983. Graham, 473 U.S. at 169 n.17. And the State of New Jersey has not waived its sovereign immunity in federal courts. Thus, none of the exceptions to the Eleventh Amendment's bar on monetary relief against state officials in their official capacity are present in this case.

In addition to these immunity issues, there are other deficiencies with respect to Plaintiffs' official-capacity claims pursuant to section 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. But states, and state officials in their official capacities, are not "persons" for section 1983 purposes. Will v. Mich. Dep't of State Police, 491 U.S. 58, 64-65 (1989).

Because Movants in their official capacities are immune from suit and because they are not "persons" under section 1983, the Court will dismiss the portions of the Complaint seeking relief against these state officials in their official capacities. In fact, having realized their mistake of law, Plaintiffs have stated that they are willing to stipulate that there is no official-capacity liability in this matter. (See dkt. entry no. 147, Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 11-13; dkt. entry no. 148, Pls.' Opp'n to Byrd's Mot. to Dismiss at 9.) Any references in the Complaint to official-capacity liability will no longer be viable.

**B.    Individual-Capacity Claims**

The Eleventh Amendment does not bar the individual-capacity claims, and state officials in their individual capacities are "persons" for the purposes of a section 1983 suit.  Hafer v. Melo, 502 U.S. 21, 30-31 (1991).

**1.    State Common-Law Claims**

With respect to the common-law claims against the Movants in their individual capacities, New Jersey state law pursuant to New Jersey's Tort Claims Act (hereinafter the "TCA") limits the circumstances in which state officials and state entities can be held liable for negligence under state law.  N.J.S.A. 59:1-1 to 12-3.  Because the TCA applies only to state-law claims and "provides no immunity" from constitutional claims brought under section 1983, Tice v. Cramer, 627 A.2d 1090, 1105 (N.J. 1993), the Court will analyze the remaining individual-capacity state common-law claims separately from the constitutional claims.

Movants have asserted that the alleged conduct at issue is shielded from liability under state law by the TCA.  Specifically, Movants argue that, pursuant to N.J.S.A. 59:6-5 and 6-6, public entities and employees are immune for "failing to diagnose a mental condition, and for any decision to confine a person for mental illness."  (DOC Defs.' Mot. to Dismiss at 14; see also Byrd's Mot. to Dismiss at 8, 11.)  Those sections provide:

14

a.   Neither a public entity nor a public employee is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or is a drug dependent person or from failing to prescribe for mental illness or drug dependence; provided, however, that nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for mental illness or drug dependence from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing.

b.   Nothing in subsection a. exonerates a public entity or a public employee from liability for injury proximately caused by a negligent or wrongful act or omission in administering any treatment prescribed for mental illness or drug dependence.

N.J.S.A. 59-6-5.

Neither a public entity nor a public employee is liable for any injury resulting from determining in accordance with any applicable enactment: (1) whether to confine a person for mental illness or drug dependence; (2) the terms and conditions of confinement for mental illness or drug dependence; (3) whether to parole, grant a leave of absence to, or release a person from confinement for mental illness or drug dependence.

N.J.S.A. 59:6-6.

Courts interpret these provisions broadly, and close calls in application are resolved in favor of immunity, not liability.  See, e.g., Charpentier v. Godsil, 937 F.2d 859, 865 (3d Cir. 1991); Greenway Dev. Co. v. Bor. of Paramus, 750 A.2d 764, 767 (N.J. 2000); Ludlow v. City of Clifton, 702 A.2d 506, 508 (N.J. App. Div. 1997); Perona v. Twp. of Mullica, 636 A.2d 535, 539 (N.J. App. Div. 1994).  These provisions reflect and advance New Jersey's public

policy in favor of providing immunity to public employees for their discretionary decision making.  Perona, 636 A.2d at 539, 541.

The New Jersey Appellate Division stated that the immunity conferred by N.J.S.A. 59:6-6 is not limited only to confinement within a "mental institution" and that the linchpin for such immunity "is a discretionary decision whether to confine a person for the care and treatment of mental illness rather than the particular type of facility in which a person may be confined." Ludlow, 702 A.2d at 508.  Immunity is also not limited to physicians and can apply to any public employee, including police officers.  Perona, 636 A.2d at 539.  Additionally, immunity is not limited to final decisions on whether to confine a person for mental illness; it applies to all determinations in the commitment process.  Ludlow, 702 A.2d at 508.

The broad construction of these immunities has led courts to apply them in a wide range of circumstances.  For example, the Appellate Division in Perona v. Township of Mullica found that police officers were immune from suit in circumstances similar to those presented by this case.  636 A.2d 535.  The police officers had responded to a domestic violence complaint and learned that Mr. Perona was attempting to prevent Mrs. Perona from taking a walk by herself because she had written him what he interpreted to be a suicide note.  Id. at 537.  Mrs. Perona denied having suicidal

intent, indicating that the note merely reflected her wishes if she were to fail to return home -- if she decided to hitchhike for example. Id. The officers were satisfied with her explanation and left the Peronas' home. Shortly thereafter, Mrs. Perona attempted suicide by walking in front of traffic on a nearby highway. Id. The Appellate Division concluded that the officers' decision not to take Mrs. Perona into custody or confinement was immune from liability under N.J.S.A. 59:6-6. Id. at 541.

In Predoti v. Bergen Pines County Hospital, the Appellate Division determined that a hospital was immune under N.J.S.A. 59:6-6. 463 A.2d 400 (N.J. App. Div. 1983). The plaintiff, who was diagnosed as suffering from "schizophrenia chronic undifferentiated suicidal," was assigned to the closed ward of the hospital where he was placed in restraints. Four days later, he was transferred to a less-restricted open ward after responding well to treatment. Id. at 401. Two days later, while on an escorted walk for open-ward patients, the plaintiff detached from the group and was injured by an automobile when he attempted to cross a highway. Id. at 402. The court concluded that the hospital was not liable for the plaintiff's injuries under N.J.S.A. 59:6-6 and stated, "Decisions affecting confinement of the mentally ill are usually highly predictive and though reasonable can lead to a demonstrably bad result. . . . By immunizing these difficult decisions the

Legislature allows them to be made in an appropriate atmosphere free from the fear of suit." Id. at 402-03.

In McNesby v. State of New Jersey, Department of Human Services, the Appellate Division again ruled in favor of immunity. 555 A.2d 1186 (N.J. App. Div. 1989). The plaintiff's decedent, who had a history of psychiatric illness and suicidal tendencies, was involuntarily committed to a psychiatric hospital, and upon his admittance, the hospital took suicide precautions, which involved keeping him within the sight of a staff member at all times. However, after several days, hospital staff determined that these precautions were no longer necessary, and he was transferred into a "step-up" ward, where he was allowed intervals of unsupervised access to the hospital grounds. Id. at 1187-88. The plaintiff's decedent subsequently set himself on fire, resulting in his death, and the plaintiff brought suit against the State. The plaintiff alleged that, unlike Predoti, she was not claiming negligence based on the decision to transfer the decedent to a less restrictive ward, but rather based on the failure to properly supervise the decedent following the transfer. Id. at 1189. On those facts, the Appellate Division ruled that the State was immune from liability under N.J.S.A. 59:6-6 because the State did not simply fail to properly supervise but instead made a deliberate choice to provide the decedent with unsupervised time, which was an integral part of

the treatment plan to prepare him for his release to the community.
Id.

With respect to immunity under N.J.S.A. 59:6-6 in this case,
Movants argue that the gravamen of the Complaint is that the
defendants, who knew or should have known of the decedent's history
of mental illness, substance abuse, and suicidal tendencies,
cleared the decedent to be released into the general prison
population rather than isolating him or providing him with constant
supervision.  (See, e.g., Byrd's Mot. to Dismiss at 8, 12.)  Thus,
Movants contend that they are immune from suit because the claims
relate to their alleged failure to properly confine the decedent
based on his mental illness and substance abuse under N.J.S.A.
59:6-6.

Plaintiffs argue that such immunity is inapplicable here and
N.J.S.A. 59:6-6 immunity relates to "whether to commit a person for
mental illness, as well as the terms and conditions of confinement
**'for mental illness or drug dependence.'"**  (Pls.' Opp'n to DOC
Defs.' Mot. to Dismiss at 23; Pls.' Opp'n to Byrd's Mot. to Dismiss
at 11-12.)  Plaintiffs contend that the Complaint alleges that
decedent was incarcerated, not that he was confined for mental-
health treatment.  (Pls.' Opp'n to Byrd's Mot. to Dismiss at 11-12;
Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 23.)  According to
Plaintiffs, the immunity at issue applies only to confinement in

facilities that render treatment for mental health. (Pls.' Opp'n to Byrd's Mot. to Dismiss at 12-13.) With respect to Byrd, Plaintiffs further argue that part of their claims rests on her alleged failure to review the decedent's transfer records and follow prison protocol, and these actions are outside of the purview of the immunity conferred by N.J.S.A. 59:6-6. (Id. at 13-14.)

Defendant Byrd responds that, in this case, the confinement that results in immunity under N.J.S.A. 59:6-6 "is not the confinement arising from criminal conduct, but rather the choice not to confine for mental illness." (Dkt. entry no. 150, Byrd's Reply Br. in Support of Mot. to Dismiss at 6.)[5] Byrd analogizes her decision to release the decedent into the general prison population to the decision of an emergency room doctor discharging a patient from a general hospital rather than placing the patient on suicide watch. (Id.) Byrd asserts that the case law contradicts Plaintiffs' contention that the confinement for the purposes of this immunity must be in a mental institution. (Id. at 6-9.) Byrd further argues that N.J.S.A. 59:6-6 applies even if Plaintiffs cast their claims as those for negligent supervision because "[t]he statutory immunity of N.J.S.A. 59:6-6 applies to all actions and inactions by the defendant which related to the

_____

[5] The DOC Defendants did not reply to the Plaintiffs' Opposition to their motion to dismiss.

determination of whether to confine the decedent for mental illness."  (Id. at 10-12.)

The Court agrees with Movants and concludes that they are immune from liability for Plaintiffs' state common-law claims based on N.J.S.A. 59:6-6.  The case law demonstrates wide-ranging applicability of this type of immunity.  It applies to police officers confining (or failing to confine) individuals for mental-health reasons.  See Perona, 636 A.2d at 541.  It applies even where the potential confinement would not be in a mental institution, but rather would be in police custody or in another ward of a hospital not specific to mental health.  See id.; Predoti, 463 A.2d at 402-03.  The Court therefore rejects Plaintiffs' arguments that the potential confinement under this provision must be in a mental institution.

The Court is not persuaded by Plaintiffs' attempts to remove this case from the realm of the provision's immunity based on the fact that the decedent was already confined because he was incarcerated.  The decision before Movants was whether to further confine the decedent from the general prison population as a result of potential mental-health issues.  Movants decided against such confinement, and therefore, their decision is one considering "whether to confine a person for mental illness or drug dependence."  N.J.S.A. 59:6-6.

The Court finds no merit in Plaintiffs' arguments that these facts are outside of the provision's purview because they are claims for negligent supervision and failure to review transfer records. The immunity afforded by N.J.S.A. 59:6-6 applies to all the decisions and conduct leading up to the decision whether to confine the individual. See Ludlow, 702 A.2d at 508. The purported failure of Byrd to review the transfer records would be conduct in the process to the ultimate confinement decision. And a claim of negligent supervision implies a duty to supervise, but in this case, as in McNesby, Movants made a deliberate decision not to supervise the decedent any more than they would the general prison population because they did not deem such supervision necessary. See McNesby, 555 A.2d at 1189. For these reasons, the Court concludes that Movants are immune from liability for the state common-law claims.

Because the Court finds that Movants are immune from liability in their individual capacities on the state common-law claims based on the operation of N.J.S.A. 59:6-6, the Court need not address their potential immunity under N.J.S.A. 59:6-5.[6] Moreover, because Movants are immune from liability on the New Jersey state-law

---

[6] The DOC Defendants also reference potential immunity under N.J.S.A. 59:6-4 without elaboration. That section relates to the failure to make, or to adequately make, a physical or mental examination. Because the Court has resolved this issue on the applicability of N.J.S.A. 59:6-6, the Court declines to address potential immunity under N.J.S.A. 59:6-4.

claims, the Court declines to consider Byrd's argument that she is
not a "person" for the purposes of the NJCRA.  (See Byrd's Mot. to
Dismiss at 16-17.)  And lastly, the Court need not address the DOC
Defendants' argument that Plaintiffs improperly filed a late Notice
of Claim, in violation of the TCA, N.J.S.A. 59:8-8 and 8-9, which
is a procedural bar to recovery.  (See DOC Defs.' Mot. to Dismiss
at 14-16.)

### 2. Constitutional Claims

The immunities established in the TCA do not provide immunity
for the constitutional claims presented under section 1983.  Tice,
627 A.2d at 1105.  The Court will analyze the individual-capacity
constitutional claims for the adequacy of the pleadings and not for
immunity-type issues.

The Court of Appeals for the Third Circuit has had occasion to
consider under which circumstances liability can be imposed under
section 1983 for prison suicides.  See Colburn v. Upper Darby Twp.,
838 F.2d 663, 667, 669 (3d Cir. 1988) (hereinafter "Colburn I");
Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)
(hereinafter "Colburn II").  A plaintiff bringing a section 1983
claim based on a prison suicide "has the burden of establishing
three elements: (1) the detainee had a 'particular vulnerability to
suicide,' (2) the custodial officer or officers knew or should have
known of that vulnerability, and (3) those officers 'acted with

reckless indifference' to the detainee's particular vulnerability."
Colburn II, 946 F.2d at 1023.  This standard balances two competing
principles.  First, "a section 1983 claim arising from a prisoner's
suicide is not per se precluded merely because the injury resulted
from the prisoner's own self-destructive behavior."  Freedman, 853
F.2d at 1115.  And second, "a prison custodian is not a guarantor
of a prisoner's safety."  Id.

The Court of Appeals for the Third Circuit has declined to
define "reckless indifference" in this standard but stated that it
implies that there was "a strong likelihood," not just a mere
possibility, of self-harm, and this standard requires that the
custodial officials "'knew or should have known' of that strong
likelihood."  Colburn II, 946 F.2d at 1024.  Relying on the
jurisprudence of sister circuits, the Court of Appeals for the
Third Circuit stated, "Custodians have been found to 'know' of a
particular vulnerability to suicide when they have had actual
knowledge of an obviously serious suicide threat, a history of
suicide attempts, or a psychiatric diagnosis identifying suicidal
propensities."  Id. at 1025 n.1.  With respect to the phrase
"should have known," the court explained that its meaning is
distinct from its usual meaning for tort-law purposes:

> [The phrase] does not refer to a failure to note a risk
> that would be perceived with the use of ordinary
> prudence.  It connotes something more than a negligent
> failure to appreciate the risk of suicide presented by

24

the particular detainee, though something less than a
subjective appreciation of that risk. The "strong
likelihood" of suicide must be "so obvious that a lay
person would easily recognize the necessity for"
preventative action; the risk of self-inflicted injury
must not only be great, but also sufficiently apparent
that a lay custodian's failure to appreciate it
evidences an absence of any concern for the welfare of
his or her charges.

Id. at 1025 (internal citation omitted).

The Court of Appeals for the Third Circuit in Colburn I and

Colburn II had the opportunity to analyze the standard for a

section 1983 claim based on a prison suicide both at the motion-to-

dismiss stage and the summary-judgment stage. In that case,

Melinda Lee Stierheim, who was visibly intoxicated, was taken into

custody by the Upper Darby police. Colburn I, 838 F.2d at 664.

Diane Miller, a custodial official with the Upper Darby police

department, searched her, but did not find a handgun. Id. at 665.

About four hours later, Stierheim shot herself in her cell with a

handgun. Id. Stierheim's mother, Sue Ann Colburn, as the

administratrix of Stierheim's estate sued the town, the police

department, Miller, and several other individuals under section

1983 for deprivation of Stierheim's constitutional rights. Id.

The court, in the decision on the motion to dismiss, detailed

the allegations of the complaint to determine whether they were

insufficient as a matter of law to assert section 1983 claims based

on a prison suicide against custodial officials in their individual

capacities. Id. at 670.[7] These facts included that: (1) the police were familiar with Stierheim from previous encounters as a result of her relationship with gang members; (2) the day before her suicide, the police had been called to her apartment after she had jumped out of a window during a fight with her boyfriend; (3) Stierheim was depressed; (4) she had obvious scars on her wrist from a prior suicide attempt; (5) an officer had to prevent her from swallowing three Valium pills that she had in her purse; (6) she was detained "for her own protection" by police; and (7) Miller discovered a round of ammunition in Stierheim's pocket. Id. On the basis of these facts, the court ruled that it could not conclude that these allegations were insufficient as a matter of law to state a section 1983 individual-capacity claim against Miller, the custodial official who had searched Stierheim and had failed to discover the handgun in her possession. Id.

Following the remand in Colburn I and further development of the record during discovery, the court granted summary judgment in favor of the defendant. Colburn II, 946 F.2d at 1027. Further discovery revealed that the incident where Stierheim jumped out a window the day before her suicide did not appear to be a suicide

---

[7] The court was relying not only on the complaint but also on the plaintiff's memorandum in opposition to the motion to dismiss, which detailed specific facts that could be asserted in an amended complaint depending on the court's ruling on the motion to dismiss. Colburn I, 838 F.2d at 670.

attempt but rather an effort to escape from her boyfriend.  Id. at 1026.  She accepted help from police officers in getting down when they arrived.  Id.

With respect to the other allegations regarding what Miller knew on the night in question, the court explained that while a trier of fact may infer that scars on Stierheim's arms were the result of a suicide attempt, the record demonstrated that no one noticed these scars on the evening of her suicide.  Id.  Nothing in the record developed through discovery indicated "that Stierheim had ever been diagnosed as suffering from a mental illness characterized by a high risk of self-inflicted harm" or that there was any other indication that Stierheim was vulnerable to suicide.  Id.  While the plaintiff had relied on Stierheim's intoxication as an indicator of vulnerability to suicide, the court noted its agreement with the majority of other circuits, "which have refused to recognize intoxication as a factor sufficient to trigger the duty to guard against self-inflicted injury."  Id.  The court further reasoned that Stierheim's possession of a bullet -- that was discovered by Miller during the search -- without more, was not an indicator of suicidal tendencies.  Id. at 1027.  Finally, the court concluded that, while consumption of a large quantity of drugs could manifest suicidal intent, the three pills that Miller

believed that Stierheim had tried to swallow were insufficient to "make it apparent that a detainee is on the verge of suicide." Id.

The court was convinced, following the development of the record through discovery, "that no fair-minded jury could conclude . . . that Stierheim had a particular vulnerability to suicide of which Miller should have been aware." Id. Thus, the court affirmed the district court's grant of summary judgment in favor of Miller. Id.

Following Colburn I and Colburn II, the Court of Appeals for the Third Circuit has had several opportunities to apply the standard for section 1983 claims based on prison suicides. In Freedman v. City of Allentown, the court found that the plaintiffs' allegations that the decedent prisoner had prominent scars on his wrists, when viewed in the light most favorable to the plaintiffs, amounted merely to negligence and did not state a viable section 1983 claim. 853 F.2d at 1116. While there were allegations that the decedent prisoner had suicidal tendencies and had previously attempted suicide, the allegations did not suggest that this was known to the individual police officers but rather that the probation officer knew about the decedent's suicidal past and failed to mention it to the officers. Id. at 1115. For these reasons, the court affirmed the dismissal of the complaint against the police officers. See id. at 1116.

Similarly, in <u>Kulp v. Veruete</u>, following discovery, the court affirmed the district court's grant of summary judgment where the defendants had recognized that the decedent had some emotional issues and potentially "passive suicidal thoughts," but two counselors, after extended evaluations, did not think it was necessary to place the decedent on suicide watch.  267 Fed.Appx. 141, 144 (3d Cir. 2008).

Where the allegations in the complaint demonstrate concrete, direct knowledge on the part of the defendant officials of the decedent's suicidal tendencies and an inexplicable disregard of the warning signs, a motion to dismiss should be denied.  For example, in <u>Tatsch-Corbin v. Feathers</u>, the complaint averred that the decedent was released into the general prison population as opposed to being placed on suicide watch even though: the defendant officials had specific, direct knowledge of the decedent's history of mental-health issues and suicide attempts; the decedent indicated he was considering killing himself to an intake officer; and the decedent made additional suicide threats to prison officials as he was escorted to and from a hearing the day before his suicide.  561 F.Supp.2d 538, 540-542 (W.D. Pa. 2008).  The United States District Court for the Western District of Pennsylvania concluded on these facts that a jury could find that

officials acted with deliberate indifference to the decedent's condition and, thus, denied the motion to dismiss.  <u>Id.</u> at 544.

Plaintiffs in this case argue that the standard for section 1983 liability in prison suicide cases is established by the facts. Plaintiffs assert that Defendants' "failure to follow protocol despite specific knowledge that it could lead to self-inflicted harm, including the failure to properly monitor and supervise the inmate in his cell and/or allow bedsheets in the cell among other failures can amount to deliberate indifference sufficient to impose individual liability."  (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 19.)

The Court will consider this standard with respect to the allegations against the defendants individually.  According to the Complaint, Dimler was responsible for supervising the decedent once he had been released into the general prison population through the time of his suicide.  (Compl. at ¶ 26.)  Teel was the medical provider responsible for the decedent's care and supervision from the time he was placed in the general prison population until his death.  (<u>Id.</u> at ¶ 32.)  Dimler and Teel "knew or should have known of the history of suicide and psychiatric illness suffered by" the decedent and that the decedent was an addict at a high risk for suicide.  (<u>Id.</u> at ¶¶ 27, 33, 62.)  According to the Complaint, both disregarded the decedent's risk of suicide and violated policy and

procedure, by failing to adequately monitor the decedent, allowing him to be in his cell with materials that could harm him, and failing to intervene to prevent the suicide.  (Id. at ¶¶ 28-29, 34-35, 60, 61.)  The Complaint also asserts that Dimler and Teel failed to review the transfer records from Kintock in order to determine what level of supervision was required.  (Id. at ¶ 36, 62.)  Dimler and Teel also purportedly failed to evaluate the decedent for intoxication as was required by prison policy and procedure.  (Id. at ¶ 53.)

The Court finds that the conclusory allegations with respect to Dimler and Teel are insufficient as a matter of law and fail to demonstrate -- even when viewed with all inferences in Plaintiffs' favor -- that they would have had any reason to be concerned about the decedent's risk of suicide.  See Freedman, 853 F.2d at 1114 (stating that court must look past conclusory allegations).  With respect to the allegations that Dimler and Teel failed to review the transfer records or evaluate the decedent for intoxication, the Court finds that these conclusory allegations, even if taken as true, would merely establish negligence and would fall short of the reckless indifference required by Colburn II.  946 F.2d at 1023. Plaintiffs have not pled -- beyond conclusory statements that merely restate the legal standard -- actual knowledge on the part of Dimler or Teel.  Id. at 1025 n.1.  Nor have Plaintiffs pled that

they "should have known" of the decedent's vulnerability to suicide, as the Complaint fails to point to any actions of the decedent that would have alerted Dimler or Teel to the fact that he was a suicide risk. Plaintiffs have not alleged how Teel and Dimler, in the course of their duties, would have been aware of the decedent's particular vulnerability. This "should have known" standard requires "something more than a negligent failure to appreciate the risk of suicide," and the Complaint, viewed in the light most favorable to Plaintiffs, does not provide allegations capable of satisfying this standard. Id. at 1025. Therefore, the Complaint will be dismissed in its entirety as to Dimler and Teel.

In contrast, the Court finds that the Complaint, when viewed in the light most favorable to Plaintiffs with all inferences drawn in their favor, states a claim against Byrd in her individual capacity under section 1983 for a prison suicide. The Complaint alleges that Byrd performed a nursing intake on January 16, 2009 and noted that the decedent had answered in the affirmative to questions regarding whether he had a history of suicidal tendencies and whether he had been hospitalized or treated for psychiatric illness. (Compl. at ¶ 50.) Despite this, Byrd purportedly cleared the decedent to be placed into the general prison population. (Id. at ¶ 59.) The Court finds that these specific allegations of Byrd's basis for knowledge of the decedent's vulnerability to

suicide are sufficient to overcome a motion to dismiss.  Colburn II
-- in reliance of the jurisprudence of other circuits --
specifically states that actual knowledge may be based on a history
of suicidal tendencies.  946 F.2d at 1025 n.1.  Plaintiffs have
adequately pled a section 1983 individual-capacity claim against
Byrd following a prison suicide based on her actual knowledge of
the decedent's particular vulnerability.

     Plaintiffs request that, if the Court deems any of the claims
insufficient (for example the individual-capacity claims against
Dimler and Teel), the Court permit additional discovery to assist
in the development of the claims in the Complaint.  (Pls.' Opp'n to
Byrd's Mot. to Dismiss at 15-16; Pls.' Opp'n to DOC Defs.' Mot. to
Dismiss at 24.)  The Court concludes that the lack of specificity
is not "fairly attributable to the defendants' control of required
information."  See Freedman, 853 F.2d at 1114.  The Court finds
that these allegations seek to impose liability against these
defendants on a negligence standard, which is not permitted for
prison suicide cases.  Therefore, the Court declines to permit
discovery to allow development of the claims against Dimler and
Teel.

## C.  **Supervisory Liability**

     With regard to the liability of the Supervisory Defendants,
Plaintiffs refer to federal jurisprudence on section 1983 municipal

liability under <u>Monell v. Department of Social Services of the City of New York</u>, 436 U.S. 658 (1978). (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.) In contrast to state government defendants, the Eleventh Amendment does not bar damage awards against municipalities and municipal officials in their official capacity. <u>Monell</u>, 436 U.S. at 690 n.54, 55. Likewise, municipal officers named in their official capacities are "persons" for section 1983 purposes. <u>Id.</u> at 690 n.55.

The one municipal defendant here -- Mercer County -- was dismissed from the action by stipulation of the parties on March 22, 2011. (<u>See</u> Stip. of Dismissal as to Mercer County.) Plaintiffs and Movants consistently treat all the individual defendants as state officials, not municipal officials. As discussed, these officials enjoy immunity under the Eleventh Amendment when sued in their official capacity. Thus, Plaintiffs' citations to municipal liability under <u>Monell</u> and its progeny are irrelevant. (<u>See</u> Pls.' Opp'n to DOC Defs.' Mot. to Dismiss at 14-16.)

Notwithstanding <u>Monell</u>'s inapplicability, supervisory liability under section 1983 is possible. However, such liability must be premised on the supervisory defendant's personal involvement in the wrongs; "it cannot be predicated solely on the operation of respondeat superior." <u>Rode v. Dellarciprete</u>, 845 F.2d

1195, 1207 (3d Cir. 1988); see also Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1991).

There are two theories under which supervisory liability may be premised for section 1983 purposes. A.M. v. Luzerne Cnty. Juv. Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004). First, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." Id. (internal quotations and citation omitted). Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." Id.; see also Rode, 845 F.2d at 1207. This second theory essentially requires that the acts or omissions of the supervisor were the "moving force" behind the harm. Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989); Jackson v. Taylor, No. 05-823, 2006 WL 2347429, at *2 (D. Del. May 12, 2006). "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Rode, 845 F.2d at 1207.

The DOC Defendants argue that, based on the foregoing, the Complaint is deficient with respect to the Supervisory Defendants –

- Balicki, Patterson, and Dunlap-Pryce.  Specifically, the DOC

Defendants argue that the Complaint lacks specific facts regarding:

(1) the conduct of the Supervisory Defendants; and (2) which policy

or procedure they failed to follow or implement.  (DOC Defs.' Mot.

to Dismiss at 12-14.)  Plaintiffs counter that the alleged facts

demonstrate "both the direct knowledge and participation of the

Supervisory Defendants in obtaining and reviewing transfer records

of inmates in their facilities" and that the Supervisory Defendants

failed "to enact, implement and enforce policies and procedures"

for: (1) the review of transfer records; and (2) the treatment of

individuals with addiction/intoxication issues or who pose a risk

of self-harm/suicide.  (Pls.' Opp'n to DOC Defs.' Mot. to Dismiss

at 18.)  Plaintiffs claim that this "foreseeably led to the suicide

of Mullin and which evidenced a gross indifference and reckless

disregard for the rights of" the decedent.  (Id.)  Plaintiffs argue

that it is unreasonable to expect them to be able to identify the

exact policy at issue, as, without discovery, Plaintiffs do not

have access to internal department policies and procedures.  (Id.

at 19.)

The Court of Appeals for the Third Circuit has addressed

claims against supervisory defendants in the prison suicide context

under similar facts.  In Colburn I, despite allowing the claims to

proceed over a motion to dismiss against the custodial official who

was personally involved in alleged wrongdoing, the court dismissed the claims against the supervisory defendants -- the police commissioner of Upper Darby Township and the mayor of Upper Darby -- in their individual capacities because the complaint lacked allegations that these supervisory defendants were personally involved in any of the activities related to the decedent's suicide.  Colburn I, 838 F.2d at 673.

The Court finds the Complaint in this case to be similarly deficient with respect to the Supervisory Defendants.  The Complaint identifies Balicki, Patterson, and Dunlap-Pryce as "supervisory official[s]."  (Compl. at ¶¶ 2-4.)  The Complaint alleges that the decedent was in the custodial care of the Supervisory Defendants and that agents of the Supervisory Defendants examined the decedent.  (Id. at ¶¶ 37, 39.)  The Complaint alleges that the Supervisory Defendants "knew or should have known based on daily intake records at their disposal that" the decedent was being transferred to their care and that he had a history of suicide attempts, psychiatric problems, and drug abuse. (Id. at ¶ 63.)  Under policy and procedure, Plaintiffs aver that the Supervisory Defendants were required to know the status of inmates brought into their facilities and to review the transfer records.  (Id. at ¶ 64.)  Plaintiffs allege that the Supervisory Defendants failed to review these records and to ensure that the

decedent was properly treated as a suicide risk.  (Id. at ¶ 65.)
Finally, Plaintiffs assert that the Supervisory Defendants failed
to enact and enforce policies and procedures requiring the review
of transfer records and the proper treatment of those who had
addiction problems or who were a suicide risk.  (Id. at ¶ 66.)

The Court finds that, as in Colburn I, these allegations are
insufficient to survive a motion to dismiss.  The Complaint lacks
any allegations that these Supervisory Defendants were personally
involved in the actions at issue.  See Colburn I, 838 F.2d at 673.
Plaintiffs do not allege that these Supervisory Defendants
participated, directed, or acquiesced in the violation of the
decedent's rights.  See A.M., 372 F.3d at 586.

While Plaintiffs also seek to hold the Supervisory Defendants
liable under the policy or practice theory of supervisory
liability, see id., the Court finds that the Complaint is far too
conclusory with respect to any deficiencies in any policy or
practice.  And while Plaintiffs have argued that it is unreasonable
to expect them to identify the policy or procedure without
discovery, the Court will not allow a fishing expedition into the
operations of the state department of corrections absent any
indication by Plaintiffs that such discovery will be fruitful.  For
these reasons, the Court will dismiss the claims asserted against
the Supervisory Defendants in their entirety.

**D.   Punitive Damages**

Plaintiffs have requested punitive damages against the individual defendants.  Punitive damages are available for section 1983 claims when the conduct of the defendant "involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983).  This is true even when the underlying liability standard for compensatory damages is that of recklessness.  Id.  Where the facts allege reckless conduct, and the allegations of the complaint with respect to that conduct are found to be sufficient to withstand a motion to dismiss, a court may decline to dismiss punitive-damage claims at the motion-to-dismiss stage.  See, e.g., Tatsch-Corbin, 561 F.Supp.2d at 545.

The claims asserted against the majority of the defendants will be dismissed, thereby resulting in the dismissal of the punitive-damage claims against these defendants as well.  However, with respect to Byrd, the Court has found that the Complaint adequately pleads a claim for relief.  Therefore, the Court declines to dismiss Plaintiffs' request for punitive damages asserted against Byrd at his juncture.

## IV.   CONCLUSION

The Court for the reasons stated above, will (1) grant the motion to dismiss by Balicki, Patterson, Dunlap-Pryce, Dimler and Teel, (2) deny the motion for judgment on the pleadings by Byrd

insofar as it concerns individual-capacity, constitutional claims asserted against her, and (3) otherwise grant Byrd's motion. Remaining before the Court in this matter are Plaintiffs' claims against Kintock (which did not move to dismiss any claims) and the constitutional claims against Byrd in her individual capacity. The Court will issue an appropriate Order.


                                    s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge


Date:      November 1, 2013