UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased and JOAN MULLIN, individually,<br>Plaintiffs,<br>v.<br><br>ADMINISTRATOR KAREN BALICKI, in her personal, individual and professional capacities representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.), DIRECTOR ROBERT PATTERSON, in his personal, individual and professional capacities, representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.) DIRECTOR MARIE DUNLAP-PRYCE, in her personal, individual and professional capacities, representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.), JANE BYRD, L.P.N., in her personal, individual and professional capacities, ERIN MARUSKY, R.N., in her personal, individual and professional capacities, OFFICER DIMLER, in his personal, individual and professional capacities BEATRICE TEEL, R.N., in her personal, individual and professional capacities, KINTOCK GROUP, MERCER COUNTY, JOHN DOES 4-10 (as yet unidentified and unknown governmental, county, or state officials, supervisors, agents or employees) in their personal, individual and professional capacities, ABC ENTITIES 1-10 (as yet unidentified and unknown governmental entities, agencies, units or subdivisions,<br>Defendants. | CIVIL ACTION NO. 3:11-cv-00247 (MLC -LHG)<br><br>THIRD AMENDED COMPLAINT AND JURY DEMAND REDACTED VERSION |

Plaintiffs, Joan Mullin as Administratrix of the Estate of Robert Mullin, and Joan Mullin,

Individually, by way of complaint against defendants, **ADMINISTRATOR KAREN BALICKI**

in her personal, individual and professional capacities representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.); **DIRECTOR ROBERT PATTERSON** in his personal, individual and professional capacities representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.); **DIRECTOR MARIE DUNLAP-PRYCE** in her personal, individual and professional capacities representing the State of New Jersey, the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception & Assignment Facility (C.R.A.F.); **JANE BYRD, L.P.N.,** in her personal, individual and professional capacities; **ERIN MARUSKY, R.N.** in her personal, individual and professional capacities; **OFFICER DIMLER** in his personal, individual and professional capacities; **BEATRICE TEEL, R.N.** in her personal, individual and professional capacities; **KINTOCK GROUP, JOHN DOES 4-10** (as yet unidentified and unknown governmental, county, or state officials, supervisors, agents or employees) in their individual and professional capacities, and **ABC ENTITIES 1-10** (as yet unidentified and unknown governmental entities, agencies, units or subdivisions, set forth the following:

## PARTIES

1. At all relevant times herein plaintiffs **JOAN MULLIN, Administratrix Ad Prosequendum of the Estate of ROBERT MULLIN, JR.,** and **JOAN MULLIN, individually,** were and are domiciliaries and residents of the County of Mercer and State of New Jersey.

2. At all relevant times herein defendant **ADMINISTRATOR KAREN BALICKI** was, upon information and belief a chief supervisory official and executive of the South Woods

State Prison, a public entity and/or an agency or division of a public entity, organized and existing under the laws of the State of New Jersey and engaged in the operation and management of a certain correctional facility, with a place of business at 215 South Burlington Road, Bridgeton, NJ 08302, acting in her personal, individual and official capacities under color of law.

3. At all relevant times herein defendant **DIRECTOR ROBERT PATTERSON** was, upon information and belief, the chief supervisory official and executive of the Department of Corrections for the State of New Jersey ("DOC"), a public entity and/or an agency or division of a public entity, organized and existing under the laws of the State of New Jersey and engaged in the operation and management of correctional facilities in the State of New Jersey with a place of business at Whittlesey Road, P.O. Box 863, Trenton, NJ 0825, acting in his personal, individual and official capacities under color of law.

4. At all relevant times herein **MARIE DUNLAP-PRYCE** was, upon information and belief a chief supervisory official and executive of Central Reception & Assignment Facility ("C.R.A.F".), a public entity and/or an agency or division of a public entity, organized and existing under the laws of the State of New Jersey and engaged in the operation and management of a certain correctional facility, with a place of business at Stuyvesant Avenue, Trenton, NJ 08628-7450, acting in her personal, individual and official capacities under color of law.

5. At all relevant times herein defendant **JANE BYRD, L.P.N.**, was, upon information and belief a health care provider and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the rendering of health care services including inmate evaluations, and acting in her personal, individual and official capacities under color of law.

6. At all relevant times herein defendant **ERIN MARUSKY, R.N.**, was, upon information and belief a health care provider and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the rendering of health care services including inmate evaluations, and acting in her personal, individual and official capacities under color of law.

7. At all relevant times herein defendant **OFFICER DIMLER**, first name unknown, was, upon information and belief a corrections officer and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal, individual and official capacities under color of law, and is substituted for **John Doe No. 1.**

8. At all relevant times herein defendant **BEATRICE TEEL, R.N.**, was, upon information and belief a health care provider and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the rendering of health care services including inmate evaluations, and acting in her personal, individual and official capacities under color of law, and is substituted for **John Doe No. 2**.

9. At all relevant times herein defendant the **KINTOCK GROUP** was and is, upon information and belief, a private company authorized to do business in the State of New Jersey, engaged in the business of providing therapeutic and other services to those persons transitioning back from incarceration into the community, known as "halfway houses" or "work houses," with a place of business at 4 South Industrial Boulevard, Bridgeton, NJ 08302.

10. At all relevant times herein defendants **JOHN DOES 3-10** and **ABC ENTITIES 1-10** were and are as yet unidentified employees, agents, servants, contractors, supervisors, officials and/or public entities, agencies and subdivisions responsible for the

operation, management and control over certain correctional facilities and custodial facilities. **JOHN DOES 3-10** are being sued in their individual, professional and personal capacities.

## NATURE OF ACTION & FACTUAL BACKGROUND

11. Plaintiff's decedent and son, the 29 year old **ROBERT MULLIN, JR**, had been incarcerated and under the custodial care of individual defendants **ADMINISTRATOR KAREN BALICKI, DIRECTOR ROBERT PATTERSON, MARIE DUNLAP-PRYCE** and **CHIEF EXECUTIVE OFFICER TERESA MCQUAIDE RN, APRN-BC** (hereinafter the "**SUPERVISOR DEFENDANTS**") for approximately six (6) to eight (8) years, through and including his date of death on January 17, 2009.

12. In or about May 2008 he was transferred to a halfway house, or "work" house under the operation and management of defendant **THE KINTOCK GROUP** (hereinafter "**KINTOCK**"), under the auspices of and by contract and agreement with the **SUPERVISOR DEFENDANTS**.

13. Plaintiff's decedent was scheduled to be released from **KINTOCK** sometime between April and June of 2009, after completing a course of therapy, work studies and services designed to allow an inmate to be rehabilitated and return to society and to his family.

14. On or about January 15, 2009, while at **KINTOCK** plaintiff's decedent exhibited deterioration in mental and psychological status, and became emotionally labile with aggressive behavior.

15. In particular, plaintiff's decedent **MULLIN** was found to be in the possession of and under the influence of controlled illegal substances including cocaine and opiates.

16. Further, **MULLIN** swallowed a handful of pills identified by the plaintiff as depression medications in front of a caseworker at Kintock, then threw the rest in a trash can.

5

17. **MULLIN** was thereafter transferred to South Woods State Prison, where he was found to be in possession of illegal and prohibited drugs and tested positive for cocaine and opiates.

18. **MULLIN** was medically evaluated at South Woods State Prison and thereafter based on certain documentation transferred to C.R.A.F. on January 16, 2009 under the custodial care, supervision, management and control of the **SUPERVISOR DEFENDANTS, JOHN DOES 4-10** and **ABC ENTITIES 1-10.**

19. Upon information and belief, at some point between January 15, 2009 and January 17, 2009, plaintiff also was treated by and was under the custodial care, supervision, management and control of Trenton Psychiatric Hospital and the employees and staff therein, including **JOHN DOES 4-10** and **ABC ENTITIES 1-10**.

20. Upon information and belief, at some point and time between January 15, 2009 and January 17, 2009 plaintiff's decedent was released to a single cell or area without adequate one on one and constant supervision and observation.

21. According to a Discharge and Continuity of Care Plan provided by defendant **KINTOCK**, Mullin had a history of high risk for alcohol and drugs which needed to be addressed, and was in need of additional services.

22. The file at **KINTOCK**, according to the Discharge and Continuity of Care Plan, indicated an extensive drug history involving the use of heroin, cocaine, marijuana, alcohol, prescription pills, speed/methamphetamine, acid/mushrooms and PCP.

23. The records from **KINTOCK** also show that **MULLIN** had recently been fired from his job that he held while maintaining residency at the halfway house, defendant **KINTOCK.** Defendant.

6

24. **MULLIN** was an addict with a history of drug abuse and suicide attempts, and immediately prior to his transfer to South Woods State Prison and C.R.A.F. was found positive for highly toxic and addictive drugs.

25. On January 17, 2009 at approximately 4:23 a.m. defendant **OFFICER DIMLER** found plaintiff's decedent unresponsive after hanging himself with what the limited records in plaintiff's possession indicate was a self-made noose made of a bed sheet. **OFFICER DIMLER** was the last person to see decedent alive, according to the Medical Examiner's Report.

26. **OFFICER DIMLER** was the individual corrections officer or staff responsible for the care, treatment, supervision and monitoring of the plaintiff's decedent, **MULLIN**, at the time of death and throughout the course of **OFFICER DIMLER'S** shift.

27. **OFFICER DIMLER** knew or should have known of the history of suicide and psychiatric illness suffered by **MULLIN** as herein described, knew or should have known based on the transfer records from **KINTOCK** that **MULLIN** was an addict and required one on one constant supervision as he was at high risk for suicide and/or self-inflicted harm.

28. **OFFICER DIMLER** knew that policy and procedure required direct and constant supervision and monitoring, and yet failed to abide by said policy and procedure, evidencing a gross indifference to the welfare of **MULLIN**.

29. **OFFICER DIMLER** permitted **MULLIN** to be in a cell with materials, such as bedsheets, which are known to be used by inmates at risk to harm themselves, including the committing of suicide, in violation of procedure, policy and protocol.

30. Defendant **BEATRICE TEEL, R.N.** was summoned to assist decedent after he was found unresponsive.

31. Decedent was pronounced dead at 4:49 AM.

32. Defendant **BEATRICE TEEL, R.N.**, was the individual medical provider and/or staff responsible for the care, treatment, supervision and monitoring of the plaintiff's decedent, **MULLIN**, at the time of death and throughout the course of **BEATRICE TEEL's** shift.

33. **BEATRICE TEEL, R.N.** knew or should have known of the history of suicide and psychiatric illness suffered by **MULLIN** as herein described, knew or should have known based on the transfer records from **KINTOCK** that **MULLIN** was an addict and required one on one constant supervision as he was at high risk for suicide and/or self-inflicted harm.

34. **BEATRICE TEEL, R.N.** knew that policy and procedure required direct and constant supervision and monitoring, and yet failed to abide by said policy and procedure, evidencing a gross indifference to the welfare of **MULLIN**.

35. **BEATRICE TEEL, R.N.** permitted **MULLIN** to be in a cell with materials, such as bed sheets, which are known to be used by inmates at risk to harm themselves, including the committing of suicide, in violation of procedure, policy and protocol.

36. Defendants **BEATRIC TEEL, R.N.** and **OFFICER DIMLER** failed to review, evaluate, or follow the transfer records of **KINTOCK,** and/or failed to obtain and review them in determining the level of care and assistance required to maintain the well-being of **MULLIN,** including care and treatment for intoxication and the one to one supervision and monitoring required.

37. During all relevant times between January 15, 2009 and the time and date of death on January 17, 2009, decedent plaintiff was under the custodial care of the **SUPERVISOR DEFENDANTS.**

38. The original death certificate states the place of death as Trenton Psychiatric Hospital; the records from the DOC indicate plaintiff's location at death was in either South

8

Woods State Prison or C.R.A.F., and the amended death certificate identifies the location of death as C.R.A.F. A detective informed plaintiff that her son, plaintiff's decedent, had died at Trenton Psychiatric Hospital.

39. On January 16, 2009, defendants **JANE BYRD, L.P.N., ERIN MARUSKY, R.N., and BEATRICE TEEL, R.N.,** acting under color of law in their personal, individual and official capacities as employees, agents and servants of the **SUPERVISOR DEFENDANTS** and/or as individual medical providers contracted to work in the facilities managed by the **SUPERVISOR DEFENDANTS,** undertook to examine and evaluate plaintiff's decedent.

40. Decedent's medical record obtained from the DOC reflects numerous entries from 2005 until his death evidencing his past suicide attempts, his diagnosis as a suicide risk, his family history of suicide, his history of mental illness including anxiety, depression and mood disorder, and his use of psychotropic medication for his psychiatric conditions.

41. On several occasions, the record reflects that decedent answered "yes" to the question "have you ever been hospitalized or treated for psychiatric illness", and "have you ever considered or attempted suicide".

42. Plaintiff Joan Mullin requested records and information regarding any investigation, follow up reports, internal affairs considerations, or any evidence of implementation of policy, procedure and standards necessary to identify and prevent occurrences such as the decedent's suicide. None were provided. Specific entries in the medical record are as follows:

43. On August 19, 2005, the decedent Robert Mullin stated during the nursing intake that he had considered or attempted suicide, and that in April 2005 he had attempted suicide. The notes on that date also reflect that the decedent was taking "psych medications."

44. On September 26, 2007, during a nursing intake, the decedent answered "yes" to the question "have you ever been hospitalized or treated for psychiatric illness," and "have you ever considered or attempted suicide." The notes on that date reflect again that decedent was taking "psych medications."

45. On September 28, 2007, notes in the medical record reflect that decedent had a diagnosis of a mood disorder.

46. On October 3, 2007, notes in the medical record reflect that that decedent had a diagnosis of a mood disorder, and he was taking the psychotropic medication Doxepin, and he was referred to "Mental Health."

47. On November 16, 2007, and on at least seven other occasions in the following two-plus years until decedent's death, notes in the medical records reflect the diagnosis of "mood disorder," a family history of suicide, and a history of being a suicide risk.

48. At least one of these entries details that the decedent was being treated for a psychiatric illness, namely depression and anxiety.

49. On January 14, 2009, three days before decedent's death, the medical record reflects that the inmate was seen at South Woods State Prison, following a transfer from Kintock to Detention/ECU, and the diagnoses of "mood disorder," a family history of suicide, and a history of being a suicide risk.

50. On January 16, 2009, an entry in the medical record identifies a "nursing intake" completed by defendant **JANE BYRD, L.P.N.** During that intake the decedent answered "Yes" to the question "have you ever been hospitalized or treated for psychiatric illness," and to the question "have you ever considered or attempted suicide." The medical record on that date also

includes the diagnoses of "mood disorder," a family history of suicide, and a history of being a suicide risk.

51. A subsequent entry on January 16, 2009, signed by defendant **ERIN MARUSKY, R.N.** at 6:26 PM, states the location of care is "Central Reception & Assignment Facility – Main," and the narrative "[inmate] medically cleared for placement on S3 … Erin Marusky, R.N. January 16, 2009 6:25 PM."

52. There is no reference in any record to a review of discharge information or transfer information from **KINTOCK** by either **JANE BYRD, L.P.N., ERIN MARUSKY, R.N.**, or **BEATRICE TEEL, R.N.** which would have notified them that **MULLIN** as an addict, a suicide risk, had a history of tremendous substance abuse, had been tested positive for opiates and cocaine immediately prior to transfer to their care, and that he required intensive medical care and supervision.

53. At no time did any of the individual defendants **JANE BYRD, L.P.N, ERIN MARUSKY, R.N., BEATRICE TEEL** or **OFFCER DIMLER** evaluate **MULLIN** for intoxication as was required under policy and procedure.

54. If said individual defendants above named had conducted a proper evaluation and review of **MULLIN**, including a review of the transfer records from **KINTOCK** and/or knowledge of same, **MULLIN** would have been transferred to the infirmary and/or been placed under constant supervision without the ability to harm himself.

55. Said individual defendants failed to adequately evaluate, supervise or monitor plaintiff, which failures were the direct and proximate cause of the self-harm and suicide by **MULLIN**.

56. Defendant **KINTOCK** failed to advise and/or notify the individual defendants **JANE BYRD, L.P.N, ERIN MARUSKY, R.N., BEATRICE TEEL** or **OFFCER DIMLER** of their findings and the need for care specifically related to addiction, psychological and emotional problems suffered by **MULLIN.**

57. On January 17, 2009 an entry in the medical record identified the event as "internal other: death of inmate." This entry shows that defendant **BEATRICE TEEL, R.N.** was with an unnamed officer in the hallway on the floor at 4:24 AM, and CPR was performed by unnamed officers or medical providers, at which time the decedent was unresponsive. The unnamed officer, upon information and belief, was **OFFICER DIMLER.**

58. A further entry in the record on Jan. 17, 2009, signed by **BEATRICE TEEL, R.N.** and showing her as the provider, identifies the event as "Emergency Report: Medical Emergency for code 66/late entry" repeats the entry, and adds a diagnosis list, including the history of mood disorder, family history of suicide, and that decedent was a suicide risk.

59. Despite a known history of suicide attempts, anxiety, depression and psychiatric instability, as well as a recent history of drug use and addiction, defendants **JANE BYRD, L.P.N.** and **ERIN MARUSKY, R.N.** determined on Jan. 16, 2009 that plaintiff's decedent was medically cleared to be released into the general population at the C.R.A.F. and/or South Woods State Prison facility under the supervision, management and control of the **SUPERVISOR DEFENDANTS.**

60. Despite a known history of decedent's suicide attempts, anxiety, depression and psychiatric instability, as well as a recent history of addiction and drug use, defendant **BEATRICE TEEL, R.N.,** on Jan. 16 and 17, 2009, failed to provide adequate medical

supervision and nursing care to decedent in the hours leading up to decedent's suicide, failed to intervene to prevent the suicide.

61. Despite a known history of decedent's suicide attempts, anxiety, depression and psychiatric instability, as well as a recent history of addiction and drug use, defendant **OFFICER DIMLER** on Jan. 16 and 17, 2009 failed to provide adequate protection and supervision to decedent in the hours leading up to decedent's suicide and failed to intervene to prevent the suicide.

62. According to the records of C.R.A.F and/or Southwoods State Prison, decedent was transferred to either general population or to a unit **REDACTED** by nurse Erin Marusky.

63. **REDACTED**

64. **REDACTED** is designated for inmates who require suicide managment and observation, among other reasons.

65. The policies and procedures for the **REDACTED**.

66. **OFFICER DIMLER** was assigned to **REDACTED** and was responsible for the supervision, care and management of decedent during the period covering the suicide.

67. **OFFICER DIMLER** last observed decedent at 3:50am on January 17, 2009, and found him dead at 4:23am, a half hour later.

68. **REDACTED**.

69. **OFFICER DIMLER** failed to attend to his obligations and failed to follow policy and protocol regarding observation and monitoring of plaintiff's decedent, which was a direct and proximate cause of decedent's death.

70. **OFFICER DIMLER** had actual knowledge and notice that decedent was a suicide risk and needed special care, monitoring and supervision, and knew that there was a

13

strong likelihood of self-inflicted harm in the event he failed to follow routine standards and policies put in place to protect inmates with special needs, including decedent.

71. **JANE BYRD, L.P.N.** was required by policy and procedure **REDACTED**, which she failed to do.

72. **JANE BYRD, L.P.N.** was required by policy and procedure to provide an **REDACTED**, policies which were not followed.

73. **JANE BYRD, L.P.N.** was required by policy and procedure to **REDACTED** which was not done.

74. Both **OFFICER DIMLER** and **JANE BYRD, L.P.N**. failed to follow policy and protocol when they failed to notify the mental health department and see to it that decedent would be placed on **REDACTED**.

75. The failures on the part of OFFICER DIMLER and JANE BYRD, L.P.N. to follow set guidelines and procedures for the management of suicidal inmates were a direct and proximate cause of his damages and death.

76. Plaintiff's decedent had a known and documented history of suicide attempts and psychiatric disturbance dating from 2005, 2007, 2008 and 2009 up to and including his final evaluation prior to his death, which was known to, and should have been known to, the **SUPERVISOR DEFENDANTS**, defendants **JANE BYRD, L.P.N., ERIN MARUSKY, R.N, BEATRICE TEEL, R.N., OFFICER DIMLER,** and **KINTOCK**.

77. Defendants **OFFICER DIMLER** and **JANE BYRD L.P.N**. had actual and specfic knowledge that plaintiff was a suicide risk based on his specific assignment and classification as a person with a history of suicide attempts who needed suicide precautions and monitoring.

78. The **SUPERVISOR DEFENDANTS**, individually **KAREN BALICKI, ROBERT PATTERSON** and **MARIE DUNLAP-PRICE,** knew or should have known based on daily intake records at their disposal and for their review that **MULLIN** was being transferred into the facilities under their management, control and supervision, and knew or should have known of his current status of addiction, history of suicide attempts, emotional problems stemming from being recently fired and his current drug use.

79. The **SUPERVISOR DEFENDANTS**, individually **KAREN BALICKI, ROBERT PATTERSON** and **MARIE DUNLAP-PRICE** under policy and procedure were required to know the status of those persons brought under the custody of their facilities, and in particular were required to know the reasons for transfer and to review the transfer records.

80. The **SUPERVISOR DEFENDANTS**, individually **KAREN BALICKI, ROBERT PATTERSON** and **MARIE DUNLAP-PRICE** failed to either obtain and/or review the transfer records from **KINTOCK,** and failed to see to it that **MULLIN** was properly treated as a suicide risk and that he was treated for drug addiction in the infirmary under close watch and supervision as opposed to being released to a cell with inadequate monitoring and supervision.

81. The **SUPERVISOR DEFENDANTS**, individually **KAREN BALICKI, ROBERT PATTERSON** and **MARIE DUNLAP-PRICE** failed to enact, implement and enforce policies and procedures requiring the review of records received from any transferring facilities, including halfway houses regarding those inmates transferred back into detention, failed to enact, implement and enforce policies and procedures for the handling of those at risk for self-harm and/or suicide and failed to enact, implement and enforce policies and procedures for the treatment of addiction and drug intoxication, all of which foreseeably led to the suicide of **MULLIN** and which evidenced a grace indifference and reckless disregard for the rights of

MULLIN and others similarly situated to be maintained in a safe environment and to be protected from inflicting self-harm.

82. Plaintiffs **JOAN MULLIN, as Administratrix Ad Prosequendum of the Estate of ROBERT MULLIN, JR., and JOAN MULLIN, individually**, institute this action for compensatory and punitive damages arising out of the unlawful actions and conduct of the **SUPERVISOR DEFENDANTS** identified as **KAREN BALICKI, ROBERT PATTERSON** and **MARIE DUNLAP-PRICE** defendants **JANE BYRD, L.P.N, ERIN MARUSKY, R.N, BEATRICE TEEL, R.N., OFFICER DIMLER, KINTOCK,** and **JOHN DOES 4-10** and **ABC ENTITIES 1-10** in violating the civil rights of plaintiff's decedent protected by and secured under the provisions of the First, Fourth, Sixth, Eighth, Ninth and Fourteenth amendments to the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Section 1983.

83. At all relevant times herein, the **SUPERVISOR DEFENDANTS,** defendants **JANE BYRD, L.P.N.** in her personal, individual and official capacities, **ERIN MARUSKY, R.N,** in her personal, individual and official capacities, **BEATRICE TEEL, R.N.,** in her personal, individual and official capacities, **OFFICER DIMLER,** in his personal, individual and official capacities, **KINTOCK, JOHN DOES 4-10** in their personal, individual and official capacities, and **ABC ENTITIES 1-10** were acting under color of state law and within the scope of their authority as agents, servants and employees of said defendants.

84. Plaintiffs also institute this action pursuant to the laws of the State of New Jersey for damages arising by reason of wrongful death, pain and suffering, hedonistic damages, negligence, infliction of mental distress, the failure to properly hire, train and supervise staff,

16

employees, agents and servants, abuse of authority, failure to provide adequate medical care and treatment, malpractice and negligence.

85. Plaintiffs were permitted to file a late Notice of Claim by Order of the Hon. Sue Regan dated February 10, 2010, which were served accordingly pursuant to New Jersey Statutes Title 59:8-4 and signed by plaintiff's representative, Shelley L. Stangler, Esq. upon the public entities employing the **SUPERVISOR DEFENDANTS, KINTOCK, JOHN DOES 4-10** and **ABC ENTITIES 1-10.**

86. More than six (6) months have elapsed since service of plaintiff's Notices of Claims and the claims remain unresolved.

87. This action was commenced within two (2) years from the date of the death, January 17, 2009.

## FIRST COUNT

88. Plaintiffs repeat each and every allegation contained in paragraphs one (1) through eighty-seven (87) as if set forth fully herein at length.

89. At all relevant times herein, the **SUPERVISOR DEFENDANTS**, defendants **JANE BYRD, L.P.N.,** acting in her personal, individual and official capacities, **ERIN MARUSKY, R.N,** acting in her personal, individual and official capacities, **BEATRICE TEEL, R.N.,** acting in her personal, individual and official capacities, **OFFICER DIMLER,** acting in his personal, individual and official capacities, **KINTOCK, JOHN DOES 4-10,** through their agents, servants and employees and acting in their personal, individual and official capacities, and **ABC ENTITIES 1-10,** were acting under color of law under the state and federal Constitutions, statutes, laws, charters, ordinances, rules, regulations, customs, usages and practices of the subject governmental departments, agencies and entities and within the scope of

17

their authority as employees and/or officers of the State of New Jersey, the DOC, South Woods State Prison and/or C.R.A.F.

90. During all relevant times herein the aforementioned defendants acted jointly and in concert with each other, and conspired and agreed between and amongst themselves to commit the unlawful violation of civil rights upon plaintiff's decedent **ROBERT MULLIN** (hereinafter "**MULLIN**") as well as to fail to provide proper medical care to **MULLIN.**

91. In particular, defendants agreed and conspired not to provide sufficient and adequate medical care to **MULLIN**, not to provide sufficient and adequate supervision, to violate protocols and policies designed to stop and avoid suicide by those persons, such as plaintiff's decedent, under the control and custody of the defendants, to fail to monitor and supervise **MULLIN**, to fail to intervene or protect **MULLIN** from danger and imminent physical harm, to fail to treat for addiction and intoxication and to allow **MULLIN** to have the ability to commit suicide.

92. During all relevant times herein the **SUPERVISOR DEFENDANTS**, defendants **JANE BYRD, L.P.N.** acting in her personal, individual and official capacities, **ERIN MARUSKY, R.N,** acting in her personal, individual and official capacities, **BEATRICE TEEL, R.N.,** acting in her personal, individual and official capacities, **OFFICER DIMLER,** acting in his personal, individual and official capacities, **KINTOCK, JOHN DOES 4-10,** acting in their personal, individual and official capacities, and **ABC ENTITIES 1-10,** by and through their agents, servants, and employees acted with deliberate and conscious indifference to **MULLIN'S** constitutional rights which violations arose out of a pattern or custom or policy and practice by each of the defendants, in permitting and allowing **MULLIN** to be unsupervised, alone, and with the wherewithal to do harm to himself, in failing to provide medical attention, in failing to

18

review transfer records and failing to see to it that each inmate was properly evaluated, in failing to see to it that **MULLIN** was maintained in the infirmary and treated for drug intoxication and addiction, in failing to enact, implement, promulgate and enforce policies, procedures and standards with respect to suicide watch and avoidance, inadequate recordkeeping, in failing to intervene, in exposing plaintiff's decedent to imminent bodily harm, which was foreseeable under the circumstances, in allowing unsafe conditions to exist in the defendant correctional facilities, infirmaries and hospital, in failing to properly hire, train and supervise their employees in the proper conduct of their duties, among other acts and omissions.

93. In particular, there are no known records of any investigation or internal affair reports made in connection with the death of **MULLIN**.

94. At all relevant times herein the defendants, individually and collectively, through their agents, servants and employees were acting within the scope of their employment and duties at the time of the subject events as well as in their personal, individual and official capacities.

95. At all relevant times herein the defendants, individually and collectively, through their agents, servants and employees, and acting in their personal, individual and official capacities, by reason of their acts, omissions, deliberate and conscious indifference to the rights of **MULLIN**, and by a pattern of abuse and violation of procedure and protocol, and failure to provide medical treatment inclusive of mental health services, and by their failure to provide **MULLIN** with a safe environment and by putting him in a position to harm himself, deprived **MULLIN** of his rights, privileges and immunities secured by the Constitution and laws of the United States, and are liable to the plaintiffs pursuant to Title 42 Sections 1983 of the United States Code and the New Jersey Civil Rights Statute Title 10 and under state common law.