**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased, and JOAN MULLIN, individually,<br><br>  Plaintiff,<br><br>  v.<br><br>ADMINISTRATOR KAREN BALICKI, et al.,<br><br>  Defendants. | CIVIL ACTION NO. 11-247 (MLC)<br><br>**MEMORANDUM OPINION** |

**COOPER, District Judge**

Plaintiff Joan Mullin, individually and as administratrix of the estate of her son, Robert Mullin ("Mullin"), commenced this action against the following defendants in their "personal, individual and professional capacities" who represent the Department of Corrections of the State of New Jersey, South Woods State Prison, and Central Reception and Assignment Facility ("CRAF"): Administrator Karen Balicki; Director Robert Patterson; and Director Marie Dunlap-Pryce.  (See dkt. 102.)[1]  Plaintiff further brought this action against the following defendants in their "personal, individual and professional capacities": Jane Byrd, LPN ("Byrd"); Erin Marusky, RN ("Marusky"); Officer Dimler; and Beatrice Teel, RN.  (See id.)  Plaintiff also named the Kintock Group and Mercer County as defendants.  (See id.)

---

[1] The Court will cite to the documents filed on the Electronic Case Filing System ("ECF") by referring to the docket entry numbers by the designation of "dkt."  Pincites reference ECF pagination.

Byrd now moves for summary judgment on all claims asserted against her.  (See dkt. 234.)  Plaintiff opposes the motion.  (See dkt. 241.)  The Court will determine the motion on the papers and without oral argument pursuant to Local Civil Rule 78.1(b).  For the reasons stated below, the Court will grant Byrd's motion.

## BACKGROUND

### I.    Factual History

The Court assumes the parties' familiarity with the facts underlying this action and will provide a brief overview of the facts pertaining to this motion.[2]  Plaintiff's allegations arise out of Mullin's suicide while incarcerated at CRAF.  (See generally dkt. 45.)

### A.    CRAF Medical Screening Policy

Pursuant to CRAF's medical screening policy, a newly admitted inmate is screened by the medical staff within four hours of arrival.  (See dkt. 234 at 6; dkt. 241 at 11; see also dkt. 241-24 at 2–8.)  The medical screening is documented in CRAF's electronic medical records.  (See dkt. 234 at 6; dkt. 241 at 13.)  If an inmate responds affirmatively to a mental health item during the screening, the inmate is flagged as "special needs" and the screening nurse must immediately refer the inmate to the Lead Psychologist or designee for further mental health evaluations.  (See dkt. 234 at 6; dkt. 241 at 13.)  This psychological follow-up must occur within seventy-two hours of the medical screening.  (See dkt. 234-5 at 27.)  If the screening nurse makes a referral of an "emergent nature," the inmate will be placed under "close or constant watch."  (See dkt. 234 at 6; dkt. 241 at 11.)  An emergent referral requires

---

[2] The Court incorporates by reference its November 1, 2013 Memorandum Opinion, which provides a detailed account of the facts and procedural history of this action.  (See dkt. 153.)

a psychological evaluation of the inmate within four hours of the medical screening.  (See dkt. 234-5 at 27–28.)  The inmate will remain under "close or constant watch" until such an evaluation is made.  (See id.)

Byrd's testimony indicates that she had knowledge of these policies.  (See dkt. 234-5 at 19–23; dkt. 241-14 at 3.)  For those policies that Byrd could not recall, she testified that her practice was always to report to her supervisor.  (See dkt. 241-15 at 8.)  Byrd was trained on how to identify special needs inmates, and was aware of the electronic medical recording requirements regarding special needs inmates.  (See dkt. 234-5 at 19; dkt. 241-14 at 5.)  Byrd testified that before beginning each medical screening, she checked the inmate's medical records for any mental health history.  (See dkt. 241-14 at 8–10.)  Byrd stated that she did not read an inmate's entire electronic medical record, but rather searched for whether the inmate was designated as special needs at another facility, or otherwise had a mental health history indicator on the file.  (See id.)

Byrd also testified that she was aware of the repercussions of designating an inmate as special needs, i.e., that it would trigger "specific actions regarding how one is to be handled in an administrative detention."  (See dkt. 241-14 at 14.)  Byrd also knew that she was required to document when an inmate exhibited signs of self-harm or a desire to harm others, and to immediately report it to her supervisor.  (See dkt. 234-5 at 20.)  Byrd testified that she did not determine inmates' housing assignments, and that this was the role of her supervisor. (See dkt. 241-14 at 4.)  Byrd also testified that she did not have control over when the psychologist would see an inmate, besides referring an inmate to her supervisor when she felt the inmate needed emergent care.  (See dkt. 241-14 at 12.)

### B.      Mullin's January 2009 Intake

In January 2009, Mullin was removed from a halfway house and taken into the custody of the New Jersey Department of Corrections after being found under the influence and in possession of cocaine and opiates.  (See dkt. 234 at 5; dkt. 241 at 6–7.)  Mullin was taken to CRAF on January 14, 2009.  (See dkt. 234 at 4.)  Mullin first met with a social worker and requested to be placed on special needs status for his anxiety.  (See id. at 5–6.)  The social worker listed him on the special needs roster and referred him to a psychiatrist for possible anxiety medication.  (See id.; dkt. 241 at 9.)  On January 16, 2009, Byrd conducted a four-hour medical screening of Mullin.  (See dkt. 234 at 6; dkt. 241 at 10.)  The mental health portion of the intake and Mullin's responses are reproduced below:

| Question | Answer |
| --- | --- |
| Are you currently or have you ever been on psychiatric medication? | No |
| Have you ever been hospitalized or treated for mental illness? | Yes, anxiety and depression – 2006 |
| Are you thinking about killing yourself? | No |
| Have you ever attempted suicide? | Yes, 4 years ago |
| Has any member of your immediate family made a serious suicide attempt or committed suicide? | No |
| Did you hold a position of authority in the community? | No |
| Was your case a shocking crime or given media attention? | No |
| Do you feel hopeless about your future? | Yes |
| Have you experienced a significant loss, such as the loss of a job you valued or the loss of a significant relationship, or death of someone close to you in the past 6 months? | No |

(Dkt. 241-12 at 3.)

During the screening, Byrd noted that Mullin did not refuse to answer questions, and did not cry, talk to himself, have noticeable scars on his wrist or neck, or appear agitated. (See id.)  Following Byrd's screening, Marusky cleared Mullin for placement in CRAF's Temporary Close Custody Unit.  (See dkt. 234 at 7.)[3]  On January 17, 2009, Mullin committed suicide in his cell.  (See dkt. 153 at 6.)  He was pronounced dead at 4:49 a.m. (See id.)

## II.      Procedural History

Plaintiff filed the second amended complaint on September 21, 2012.  (See dkt. 102.) Plaintiff alleged several federal constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), as well as analogous claims under the New Jersey Constitution pursuant to the New Jersey Civil Rights Act ("NJCRA").  (See id. at 9–14.)  See also N.J.S.A. 10:6-2.  Plaintiff also set forth various claims arising under common law, such as negligent hiring, intentional and negligent infliction of emotional distress, abuse of process, and medical malpractice. (See dkt. 102 at 9–14.)

Mercer County was dismissed from the action by stipulation of the parties on March 22, 2011.  (See dkt. 15.)  Plaintiff agreed to the dismissal of the claims against Marusky by order of the Court on May 2, 2013.  (See dkt. 139.)  All claims against Administrator Karen Balicki, Director Robert Patterson, Director Marie Dunlap-Pryce, Officer Dimler, and Beatrice Teel, RN were dismissed on November 1, 2013 by way of the Court's order and

---

[3] The Temporary Close Custody Unit is designated for inmates who are removed from the general population for disciplinary or administrative reasons including rule infractions, alleged violations of prohibited acts, protective custody, or for special observation.  (See dkt. 234 at 7.)  Pursuant to CRAF policy, inmates in close custody are monitored by a custody officer every fifteen minutes.  (See dkt. 234-6 at 6.)

memorandum opinion ("11-1-13 Order & Opinion").  (See dkt. 153; dkt. 154.)  The 11-1-13

Order and Opinion also dismissed all common law claims against Byrd.  (See id.)  Kintock

Group was dismissed from the action by stipulation of the parties on November 13, 2015.

(See dkt. 246.)  Thus, Byrd is the only remaining defendant, and the only remaining viable

claims are the alleged constitutional violation under the Eighth Amendment and the

analogous provision of the New Jersey Constitution.

## DISCUSSION

### I.    Legal Standard

#### A.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment is proper "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Material facts are those "that

could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if

the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving

party."  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (internal citation and

quotation omitted).  This evidence may include "citing to particular parts of materials in the

record" or a "showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact."  Fed.R.Civ.P. 56(c)(1)(A)–(B).

If the movant demonstrates an absence of genuinely disputed material facts, then the

burden shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non–moving party, there is no genuine issue for trial." Id. (internal quotation marks omitted). The non-movant must show the existence of issues for trial by referring to the record. See Fed.R.Civ.P. 56(c)(1).

When determining whether a genuine dispute of material fact exists, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. See Scott v. Harris, 550 U.S. 372, 380 (2007); Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). If the non-movant fails to demonstrate that at least one genuine factual dispute exists for trial, then the Court must determine whether the movant is entitled to judgment as a matter of law. See McCann v. Unum Provident, 921 F.Supp.2d 353, 357 (D.N.J. 2013). "A movant is entitled to judgment as a matter of law if, at trial, no reasonable jury could find for the non-moving party." Id.

**B.    Section 1983**

A plaintiff may have a cause of action under Section 1983 for certain violations of constitutional rights. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

42 U.S.C. § 1983.

To state a claim for relief under Section 1983, a plaintiff must allege: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged

deprivation was committed or caused by a person acting under color of state law.  See

Harvey v. Plains Twp. Police Dep't, 635 F.3d 606, 609 (3d Cir. 2011).  "The traditional

definition of acting under color of state law requires that the defendant in a § 1983 action

have exercised power possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law."  West v. Adkins, 487 U.S. 42, 49

(1988) (internal quotation omitted).  Further, "a public employee acts under color of state law

while acting in his official capacity or while exercising his responsibilities pursuant to state

law."  Id. at 50.

 This Court discussed at length in its 11-1-13 Opinion the circumstances under which

the United States Court of Appeals for the Third Circuit ("Third Circuit") recognizes that a

court may impose liability under Section 1983 for prison suicides.  (See dkt. 153 at 23–33.)

See also Colburn v. Upper Darby Twp., 946 F.2d 1017 (3d Cir. 1991) (hereinafter "Colburn

II"); Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988).  A plaintiff bringing a

Section 1983 claim based on a prison suicide must establish three elements: "(1) the detainee

had a particular vulnerability to suicide, (2) the custodial officer or officers knew or should

have known of that vulnerability, and (3) those officers acted with reckless indifference to

the detainee's particular vulnerability."  Colburn II, 946 F.2d at 1023 (internal quotation

omitted).

 A particular vulnerability to suicide exists if the suicide was "a strong likelihood,

rather than a mere possibility."  Colburn II, 946 F.2d at 1024.  The Third Circuit defined a

strong likelihood as follows:

> The strong likelihood of suicide must be "so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

Id. at 1025 (internal citation and quotation omitted).

"[I]t is clear that mere negligence on the part of prison officials is insufficient to establish a claim pursuant to § 1983." Kulp v. Veruete, 267 Fed.Appx. 141, 143 (3d Cir. 2008); see also Hinton v. United States, No. 14-854, 2015 WL 737584 (M.D. Pa. Feb. 20, 2015) (granting summary judgment for prison officials because there was not "strong likelihood" that decedent might have committed suicide, as decedent had not demonstrated suicidal ideation in six years).

## C.   NJCRA

The NJCRA provides, in part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State . . . may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2.

The NJCRA is interpreted as analogous to Section 1983.  See, e.g., Szemple v. Corr. Med. Servs., 493 Fed.Appx. 238, 241 (3d Cir. 2012); Trafton v. City of Woodbury, 799 F.Supp.2d 417, 443 (D.N.J. 2011); Rezem Family Assocs., LP v. Borough of Millstone, 423 N.J.Super. 103, 115 (N.J. App. Div. 2011).  Plaintiff bases the NJCRA claim on Article I, Paragraph 12 of the New Jersey Constitution, which provides, in relevant part: "Excessive bail shall not be required, excessive fines shall not be imposed, and cruel and unusual

punishment shall not be inflicted." N.J. Const. Art. I, Para. 12. This provision of the New

Jersey Constitution is interpreted as corresponding to the Eighth Amendment. See Edwards

v. Power, No. 07-4121, 2014 WL 5092916, at *5 (D.N.J. Oct. 10, 2014); see also State v.

Des Marets, 92 N.J. 62, 82 (1983).

## II.      Analysis

### A.      Section 1983

Plaintiff is first required to show that Mullin had a "particular vulnerability to

suicide." See Colburn II, 946 F.2d at 1024. "[T]he requirement of reckless or deliberate

indifference implies that there must be a strong likelihood, rather than a mere possibility, that

self-inflicted harm will occur." Id. (internal quotations omitted). In support of this first

factor, Plaintiff argues that there was a strong likelihood of suicide in the present case

because Mullin was a special needs inmate, "had a history of suicide," and answered "yes" to

when asked if he felt hopeless during the medical screening. (See dkt. 241-1 at 11.)

Byrd argues that Mullin was classified as special needs due to his anxiety. (See dkt.

244 at 6.) She further argues that Mullin denied wanting to hurt himself, was not currently

taking any psychiatric medications, and did not present himself with any emergent conditions

or suicidal ideation that would require an immediate psychological referral. (See dkt. 234-1

at 9.)

The Court finds that Mullin's previous suicide attempt reflects past suicidal ideation.

See Estate of Cills v. Kaftan, 105 F.Supp.2d 391, 398 (D.N.J. 2000). But the Third Circuit

instructs that a decedent's particular vulnerability to suicide must be a "strong likelihood" for

the purpose of Section 1983 liability to attach. Colburn II, 946 F.2d at 1024. Here, Mullin

indicated during his medical screening that he did not want to harm himself.  (<u>See</u> dkt. 241-12 at 3.)  This answer was consistent with Mullin's statement to a nurse and the social worker two days prior.  (<u>See</u> dkt. 234-1 at 7.)  Mullin had no other suicide attempts in the intervening years.  (<u>See</u> <u>id.</u>)  He was not "acting irate, talking to himself, crying, [or] belligerent" during the medical screening, and thus immediate psychological help was not necessary under CRAF policy.  (<u>See</u> dkt. 241-14 at 12.)

Moreover, Mullin's acknowledgement of feeling hopeless about his situation is not unusual given the circumstances: he had previously been serving his sentence in a halfway house, and was sent to CRAF for a violation of probation when he was found in possession and under the influence of cocaine and opiates.  (<u>See</u> dkt. 240 at 6.)  Although Mullin's past suicide attempt may illustrate a mere possibility of suicide, Plaintiff has not presented further evidence showing that this suicide attempt made Mullin's suicide a "strong likelihood" as required under <u>Colburn II</u>.  <u>See</u> <u>Colburn II</u>, 946 F.2d at 1024.  The Court, when viewing this evidence in favor of Plaintiff, does not find that there was a strong likelihood of suicide given the facts above.

Plaintiff must next show that the strong likelihood of suicide was so obvious that a layperson would easily recognize the necessity for preventative action.  <u>See</u> <u>id.</u> at 1025.  "Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities."  <u>Id.</u> at n.1.  Here, Plaintiff argues that Byrd knew or should have known of the strong likelihood of suicide because Mullin was designated as a special needs inmate "within hours prior to his

evaluation by Nurse Byrd." (See dkt. 241-1 at 9.)   At the same time, Plaintiff argues that Byrd was under a "duty to specifically put in the chart the classification of Mullin as a Special Needs inmate." (See id. at 10.) Byrd argues that she could not know of a strong likelihood of suicide in this case because "Mullin did not demonstrate any suicidal ideation in the four-year period prior to his death." (Dkt. 234-1 at 7.)

A fair reading of the record indicates that an inmate can be designated as special needs when he or she "meets criteria of axis I and/or axis II disorder per the most recent edition of the Diagnostic and Statistical Manual (DSM) which interferes with the inmate's ability to meet the functional requirements of prison life without mental health treatment." (See dkt. 241-24 at 3.) Thus, special needs status does not equate to suicide risk.  Here, there was no obvious suicide threat, no history of repeated suicide attempts, or no psychiatric diagnosis identifying suicidal propensities. Colburn II, 946 F.2d at 1025 n.1.  It is also inapposite that Byrd herself did not designate Mullin as special needs, as the social worker had already added Mullin to the special needs roster two days prior. (See dkt. 234 at 5–6; dkt. 241 at 9.) Moreover, pursuant to CRAF policy, Byrd indicated that Mullin required a psychological follow-up because of his affirmative response to one of the mental health items during her screening.[4]  Even if the Court found that there was a strong likelihood of suicide in this case, the Court cannot conclude that a reasonable jury would find that Byrd

---

[4] Plaintiff also argued that Byrd was "specifically aware that the failure to properly designate the inmate and notify mental health could result in suicide." (See dkt. 241-1 at 10.)  This argument is conclusory. See Colburn II, 946 F.2d at 1027 ("Only an exercise in impermissible judicial hindsight could justify holding [these officers] responsible for [the subsequent] suicide.").  The record indicates that Mullin was already designated as a special needs inmate by the social worker, and that Byrd had requested a psychological follow-up for Mullin. (See dkt. 234 at 5–6; dkt. 241 at 9.)

knew or should have known of this strong likelihood based upon Mullin's designation as special needs.

Lastly, Plaintiff must show that the prison officers "acted with reckless indifference to the detainee's particular vulnerability." See Colburn II, 946 F.2d at 1023 (internal quotations omitted). "[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." Id. at 1025. The record reflects that Byrd understood the CRAF policies on medical screenings and the mental health needs of inmates. See Background, Section I.A., supra. There is no evidence indicating that Byrd deviated from these policies, i.e., acted culpably, with respect to Mullin. Rather, the record indicates that Byrd followed protocol by properly indicating that Mullin required a psychological follow-up because of his special needs status and his affirmative response to one of the screening questions. This was the extent of Byrd's interaction with Mullin; she played no role in his placement within CRAF. Thus, the Court finds that the alleged conduct of Byrd does not amount to reckless or deliberate indifference.

The Court concludes that Plaintiff has not presented evidence from which a jury could reasonably conclude that: (1) Mullin had a particular vulnerability to suicide; (2) Byrd knew or should have known of the decedent's particular vulnerability to suicide; and (3) Byrd acted with reckless indifference to that vulnerability, such that Byrd is liable under Section 1983.

**B.     NJCRA**

Claims asserted under the NJCRA are analyzed analogously to Section 1983 claims.
<u>See</u> Discussion, Section I.C., <u>supra</u>.  Moreover, Plaintiff has alleged violations of Article 1,
Paragraph 12 of the New Jersey Constitution, which corresponds to the Eighth Amendment.
<u>See</u> <u>id.</u>  Because Plaintiff's Eighth Amendment claim under Section 1983 fails, and Plaintiff
has not presented another theory of liability under the NJCRA, the Court will grant Byrd's
motion for summary judgment as to the NJCRA claims asserted against her.

## CONCLUSION

The Court, for the reasons stated, will grant the pending motion for summary
judgment and enter judgment in favor of Defendant Byrd.  The Court will issue an
appropriate order and judgment.

  s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


**Dated:**      May 25, 2016

14