UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOAN MULLIN, ADMINISTRATRIX OF THE ESTATE OF ROBERT MULLIN, deceased and JOAN MULLIN, individually,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**JANE BYRD, L.P.N.,** in her personal and individual capacities, **OFFICER NICHOLAS DIMLER,** in his personal and individual capacities, **OFFICER ROBERT RUSSO,** in his personal and individual capacities, **CHIEF RALPH YANSEK,** in his personal and individual capacities, **Lt. DUDICH,** in his personal and individual capacities, **SGT. B. STERN,** in his personal and individual capacities, **SGT. THOMAS SPENCE,** in his personal and individual capacities, **OFFICER ERIC LARGE,** in his personal and individual capacities, **KINTOCK GROUP, JOHN DOES 4-10** (as yet unidentified and unknown governmental, county, or state officials, supervisors, agents or employees) in their personal, individual and professional capacities, **ABC ENTITIES 1-10** (as yet unidentified and unknown governmental entities, agencies, units or subdivisions,<br><br>**Defendants.** | **CIVIL ACTION NO. 3:11-cv-00247 (MLC -LHG)**<br><br><br>**THIRD AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs, Joan Mullin as Administratrix of the Estate of Robert Mullin, and Joan Mullin,

Individually, by way of complaint against defendants, **JANE BYRD, L.P.N.,** in her personal and

individual capacities; **OFFICER NICHOLAS DIMLER,** in his personal and individual

capacities, **OFFICER ROBERT RUSSO,** in his personal and individual capacities, **CHIEF**

**RALPH YANSEK,** in his personal and individual capacities **LT. DUDICH,** in his personal and

individual capacities, **SGT. B. STERN,** in his personal and individual capacities, **SGT.**

**THOMAS SPENCE,** in his personal and individual capacities, **OFFICER ERIC LARGE,** in his personal and individual capacities, **KINTOCK GROUP, JOHN DOES 8-10** (as yet unidentified and unknown governmental, county, or state officials, supervisors, agents or employees) in their individual and personal capacities, and **ABC ENTITIES 1-10** (as yet unidentified and unknown governmental entities, agencies, units or subdivisions, set forth the following:

<u>**PARTIES**</u>

1.     At all relevant times herein plaintiffs **JOAN MULLIN, Administratrix Ad Prosequendum of the Estate of ROBERT MULLIN, JR.**, and **JOAN MULLIN, individually,** were and are domiciliaries and residents of the County of Mercer and State of New Jersey.

2.     At all relevant times herein defendant **JANE BYRD, L.P.N. ("JANE BYRD," or "NURSE BYRD"**, was, upon information and belief a health care provider and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the rendering of health care services including inmate evaluations, and acting in her personal and  individual capacities under color of law.

3.     At all relevant times herein defendant **OFFICER NICHOLAS DIMLER**,  was, upon information and belief a corrections officer and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and  individual capacities under color of law, and is substituted for John Doe No. 1.

4.      At all relevant times herein defendant **OFFICER ROBERT RUSSO**,  was, upon information and belief a corrections officer and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual  capacities under color of law, and is substituted for John Doe No. 3 (former defendant Beatrice Teel, R.N. had been substituted as John Doe No. 2 but has since been dismissed from the case).

5.      At all relevant times herein defendant **CHIEF RALPH YANSEK**, was, upon information and belief a Supervisor in the housing unit for plaintiff's decedent, and was an employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual capacities under color of law, and is substituted for John Doe No. 4.

6.      At all relevant times herein defendant **LT. DUDICH**, was, upon information and belief a Supervisor in the housing unit for plaintiff's decedent, and was an employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual capacities under color of law, and is substituted for John Doe No. 5.

7.      At all relevant times herein defendant **SGT. B. STERN**, was, upon information and belief a Supervisor in the housing unit for plaintiff's decedent, and was an employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual capacities under color of law, and is substituted for John Doe No. 6.

8.      At all relevant times herein defendant **SGT. THOMAS SPENCE**, was, upon

information and belief a Supervisor in the housing unit for plaintiff's decedent, and was an employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual capacities under color of law, and is substituted for John Doe No. 7.

9.     At all relevant times herein defendant **OFFICER ERIC LARGE,** was, upon information and belief a corrections officer and employee, agent or servant of the State of New Jersey, DOC, South Woods State Prison, and/or C.R.A.F., engaged in the supervision of inmates, and acting in his personal and individual capacities under color of law, and is substituted for John Doe No. 8.

10.     At all relevant times herein defendant the **KINTOCK GROUP** was and is, upon information and belief, a private company authorized to do business in the State of New Jersey, engaged in the business of providing therapeutic and other services to those persons transitioning back from incarceration into the community, known as "halfway houses" or "work houses," with a place of business at 4 South Industrial Boulevard, Bridgeton, NJ 08302.

11.     At all relevant times herein defendants **JOHN DOES 9-10** and **ABC ENTITIES 1-10** were and are as yet unidentified employees, agents, servants, contractors, supervisors, officials and/or public entities, agencies and subdivisions responsible for the operation, management and control over certain correctional facilities and custodial facilities. **JOHN DOES 8-10** are being sued in their individual and personal capacities.

## NATURE OF ACTION & FACTUAL BACKGROUND

12.     Plaintiff's decedent and son, the 29 year old **ROBERT MULLIN, JR,** ("**MULLIN**") had been incarcerated and under the custodial care of individual defendants **CHIEF EXECUTIVE OFFICER TERESA MCQUAIDE RN, APRN-BC** (hereinafter the

4

"**SUPERVISOR DEFENDANT**") for approximately six (6) to eight (8) years, through and including his date of death on January 17, 2009.

13.     In or about May 2008 **MULLIN** was transferred to a halfway house, or "work" house under the operation and management of defendant **THE KINTOCK GROUP** (hereinafter "**KINTOCK**"), under the auspices of and by contract and agreement with the **SUPERVISOR DEFENDANT**.

14.     Plaintiff's decedent was scheduled to be released from **KINTOCK** sometime between April and June of 2009, after completing a course of therapy, work studies and services designed to allow an inmate to be rehabilitated and return to society and to his family.

15.     On or about January 15, 2009, while at **KINTOCK** plaintiff's decedent exhibited deterioration in mental and psychological status, and became emotionally labile with aggressive behavior.

16.     In particular, plaintiff's decedent **MULLIN** was found to be in the possession of and under the influence of controlled illegal substances including cocaine and opiates.

17.     Further, **MULLIN** swallowed a handful of pills identified by the plaintiff as depression medications in front of a caseworker at Kintock, then threw the rest in a trash can.

18.     **MULLIN** was thereafter transferred to South Woods State Prison, where he was found to be in possession of illegal and prohibited drugs and tested positive for cocaine and opiates.

19.     **MULLIN** was medically evaluated at South Woods State Prison and thereafter based on certain documentation transferred to C.R.A.F. on January 16, 2009 under the custodial care, supervision, management and control of the **JANE BYRD, L.P.N, OFFICER NICHOLAS DIMLER, OFFICER ROBERT RUSSO, CHIEF RALPH  YANSEK, Lt.**

**DUDICH, SGT. B. STERN, SGT. THOMAS SPENCE, OFFICER ERIC LARGE, KINTOCK GROUP, JOHN DOES 9-10** and **ABC ENTITIES 1-10.**

20.     Upon information and belief, at some point between January 15, 2009 and January 17, 2009, plaintiff also was treated by and was under the custodial care, supervision, management and control of Trenton Psychiatric Hospital and the employees and staff therein, including **JOHN DOES 9-10** and **ABC ENTITIES 1-10**.

21.     Between January 15, 2009 and January 17, 2009 plaintiff's decedent was released to a single cell or area without adequate one on one and constant supervision and observation.

22.     According to a Discharge and Continuity of Care Plan provided by defendant **KINTOCK**, Mullin had a history of high risk for alcohol and drugs which needed to be addressed, and was in need of additional services.

23.     The file at **KINTOCK**, according to the Discharge and Continuity of Care Plan, indicated an extensive drug history involving the use of heroin, cocaine, marijuana, alcohol, prescription pills, speed/methamphetamine, acid/mushrooms and PCP.

24.     The records from **KINTOCK** also show that **MULLIN** had recently been fired from his job that he held while maintaining residency at the halfway house, defendant **KINTOCK.**

25.     **MULLIN** was an addict with a history of drug abuse and suicide attempts, and immediately prior to his transfer to South Woods State Prison and C.R.A.F. was found positive for highly toxic and addictive drugs.

26.     Plaintiff was identified by a Licensed Social Worker prior to transfer to the **C.R.A.F.** facility as a Mental Health Special Needs Inmate.  (Missing Disc Discovery, CM 0289, Exhibit "K" to the Certification of counsel  in support of motion for reconsideration, ,April 2014,

docket entries #  185 and 186)[1].  A  Special Needs Inmate is an inmate suffering from a psychiatric condition who is "unable to meet the functional requirements of incarceration without mental health treatment" in accordance with stated Department of Corrections (DOC) policy and constitutes a potential suicide risk. (CM 0391, July 2013 discovery, Exhibit "L" ).

27.    There was an active directive in effect when **MULLIN** was transferred to **C.R.A.F.** classifying him as a Mental Health Special Needs inmate which was not changed or removed (Missing Disc Discovery, CM 0289, Exhibit "K").

28.    The Special Needs designation was noted on a transfer sheet sent from Southwood to C.R.A.F. as part of the electronic medical records.  (Missing Disc, CM 0289, 0290, 0291, see also, Second Amended Complaint 'SAC.', Dkt. Entry 102, para 52.)

29.    The Special Needs designation was part of the medical records and part of **MULLIN'S** file electronically maintained which was known to **NURSE BYRD** (Missing Disc, CM 0289, Exhibit "K").

30.    **NURSE BYRD,** as the initial screening nurse, was required to review any transfer records and the medical records maintained on all inmates, and in particular plaintiff's decedent, but failed to do so (Missing Disc Discovery, CM 0289, July 2013 discovery, CM 0393, Exhibit "E," CM 0410, Exhibit "F," See also, SAC, at paras  52, 53, and 54.)

31.    Plaintiff's decedent was required to and was placed on a Special Needs Roster available to all monitoring, housing, supervisory and medical personnel.  Special procedures and policies were in place to deal with the mental health needs of Special Needs inmates, including monitoring for suicide potential, and being aware of those risks. (Missing Disc Discovery, CM

---

[1] "Missing Disc" discovery refers to the April 2013 discovery consisting of 2 discs one of which was misplaced and not printed out, and the subject of counsel's March 4, 2014, docket entry # 182, letter to Judge Cooper. Designations "CM" or "DOC" refer to Bates number designations by the state;  Exhibits referred to  were those submitted with counsel's certification on the motion to reconsider, docket entries # 185 and 186, hereinafter referred to only by Exhibit designation.

0012, 0013, showing that **MULLIN** was entered on the Mental Health Special needs Roster on January 16, 2009; July 2013 discovery, CM 0393, Exhibit "L,", CM 0418-0419, "Exhibit "M").

32.    When interviewed by the Licensed Clinical Social Worker prior to transfer to **C.R.A.F.**, **MULLIN** stated that he needed mental health treatment and medication, and the interview was contained in the electronically maintained records available to the staff at **C.R.A.F.** (Missing Disc Discovery, CM 0289, 0011, 0012, 0013, 0014, Exhibit "C" to counsel's Certification in Support of the Notice of Motion to Amend, Dkt. Entry No. 207).

33.    Specific policy required that in the event the screening nurse received a positive response to a mental health question or item which was part of the normal screening process he/she was mandated to immediately refer the inmate to a psychologist, and further to make sure that the inmate would be placed on Close or Constant watch until evaluated by the psychologist or mental health designee. (July 2013 discovery, CM 0420, 0421, Exhibit "M").

34.    **NURSE BYRD** did obtain a positive response to a mental health item in that plaintiff answered in the affirmative when asked if he had ever tried to commit suicide and whether he had ever been treated for a psychiatric disorder (SAC, para. 50).

**35.**    **NURSE BYRD** failed to provide an appropriate suicide assessment intake despite direct knowledge from the Medical Chart and plaintiff's answers to her questions that plaintiff has a history of suicide attempts, had been transferred from a halfway house under circumstances evidencing manifestation of a psychological or psychiatric disorder, and had been designated a Special Needs Inmate, and failed to follow specific policy requiring that **MULLIN** be seen by a mental health professional prior to his placement in detention and that he be placed on Close or Constant Watch (Missing Disc Discovery, CM 0289; 0011, 0012, 0013; Exhibit "C" to counsel's

Certification in Support of the Notice of Motion to Amend, Dkt. Entry No. 207; July 2013 discovery CM 0418-0421, Exhibit "M;" SAC paras. 81,82).

36.     Plaintiff was transferred to a Housing Unit South designed for administrative segregation as well as suicide watch,  designated a Close Custody Unit. (SAC, para. 51; Missing Disc Discovery CM 0272, transfer to "south 3 and placed in detention," part of Exhibit "I;" April 2013 discovery, DOC **MULLIN** 0367, Exhibit "J;" July 2013 discovery, CM 0360, Exhibit "C," CM 0370, Exhibit "E," CM 0464, Exhibit "G," CM 0420, Exhibit "M," CM 0636, Exhibit "N." )

37.     Policy requires high levels of monitoring and supervision in the Close Custody Unit, consisting of either 15 minute intervals or Constant Observation (April 2013 discovery, DOC **MULLIN** 0365, 0366, Exhibit "F;" July 2013 discovery, CM 0370, Exhibit "E," CM 0464, Exhibit "G").

38.     Constant Observation requires uninterrupted observance of one inmate to be conducted in person or by video monitor when the video monitor provides continuous unobstructed vigilance (July 2013 discovery, CM 0370, Exhibit "E").

39.     Close Watch requires "intermittent monitoring of an inmate either in person or by video monitoring at 15 minute intervals." July 2013 discovery, CM 0370, Exhibit "E").

40.     **MULLIN** was required by policy and procedures based on his status as Mental Heath Special Needs inmate to have been placed on either Close or Constant Observation at the time he was transferred to the designated housing unit. (July 2013 discovery, CM 0428, Exhibit "O," CM 0418, 0420-21, Exhibit "M").

41.     **MULLIN** was not monitored on either Close or Constant Watch as mandated by policy by **DIMLER, RUSSO** or **LARGE** (Missing Disc, CM 0243, statement of inmate that **DIMLER** was only seen at the beginning of his shift; April 2013 discovery, DOC **MULLIN**

0365, 0366, no Observation Reports showing documented 15 minute watch during shifts 2 and 3 up to the time of suicide, including officers **RUSSO** and **LARGE** (*See also*, SAC para 55). **DIMLER** failed to supervise or monitor plaintiff; SAC, para 61, **DIMLER** failed to provide adequate protection and supervision over **MULLIN**; Defendants failed to enforce, follow and maintain protocol and policy, SAC para. 108).

42.    A mental health evaluation utilizing the Suicide Risk Assessment and Suicide Risk Precautions will be provided upon transfer to the Close Custody Unit for an inmate assessed as a Suicide or Special Needs risk (July 2013 discovery, CM 0425, 0428, Exhibit "O," CM 0370, Exhibit "E"; knowing that plaintiff was special needs classification, Missing Disc Discovery.)

43.    Upon transfer a psychologist or psychiatrist will conduct an initial assessment and complete a suicide watch notice of the inmate to evaluate the severity of the suicide threat and determine the appropriate type of watch (July 2013 discovery, CM 0372, Exhibit "E").

44.    In accordance with policy, a determination will be made as to what items will be permitted in the cell, including blankets or sheets. *Id.*

45.    Pursuant to policy, if a mental health professional is not available due to the time of the transfer after business hours, then the person being transferred must be under Constant Watch until such time as an appropriate evaluation is made (July 2013 discovery, CM 0370; 0372, Exhibit "E").

46.    **NURSE BYRD** failed to refer decedent's case for a mental health evaluation, failed to utilize the proper assessment mechanisms in place by policy, failed to see to it that decedent was evaluated by a psychologist or psychiatrist upon transfer, failed to document the type of watch necessary, all a direct and proximate cause of decedent's death. (SAC para. 77, July 2013 discovery, *Id.*)

47.     On January 17, 2009 at approximately 4:23 a.m. defendant **OFFICER DIMLER** found plaintiff's decedent unresponsive after hanging himself with a self-made noose made of a bed sheet.   **OFFICER DIMLER** was the last person to see decedent alive, according to the Medical Examiner's Report.

48.     **OFFICER DIMLER** was the individual corrections officer or staff responsible for the care, treatment, supervision and monitoring of the plaintiff's decedent, **MULLIN**, at the time of death and throughout the course of **OFFICER DIMLER'S** shift.

49.     **OFFICERS RUSSO** and **LARGE** were the corrections officers responsible for the second shift oversight and supervision of decedent **MULLIN** (Missing Disc Discovery, CM 0239 *et. seq.*, Exhibit "I").

50.     **OFFICER DIMLER** on the third shift, **OFFICER RUSSO** and **OFFICER LARGE** were the officers responsible for monitoring and supervision of **MULLIN** under mandated policies and procedures, and failed to monitor decedent either on Constant Watch or Close Watch at a minimum of 15 minute intervals, said failure being a direct and proximate cause of decedent's death (Missing Disc Discovery, CM 0239 et seq., Exhibit "I;" April 2013 discovery, DOC 0365-66, Exhibit "F").

51.     **CHIEF YANSEK, LT DUDICH, SGT STERN** and **SGT THOMAS** were supervisory and commanding officers overseeing defendants **DIMLER, RUSSO** and **LARGE** who failed to follow policy and procedure in the review of transfer and medical records, failed to check the Special Needs Roster, and failed to properly supervise **OFFICERS DIMLER, RUSSO** and **LARGE** in the performance of their mandated tasks, including the following of policy regarding monitoring of inmates, special needs, suicide watch and prevention, and

recordkeeping, including proper logbook entries (Missing Disc Discovery, Exhibit "I;"   July 2013 discovery).

52.   **CHIEF YANSEK, LT DUDICH, SGT STERN, SGT THOMAS, OFFICER DIMLER, OFFICER RUSSO** and **OFFICER LARGE**   were obligated by policy to know which inmates under their watch were designated Special Needs, and in fact had direct knowledge that **MULLIN** was a Special Needs inmate requiring special precautions and monitoring (July 2013 discovery, CM 0464, 0471, 0393, 0419).

53**.**   **OFFICER RUSSO** was also an officer responsible for monitoring and supervision over the plaintiff during the second shift (Missing Disc Discovery, Exhibit "I").

54.   Several inmates stated that **MULLIN** requested to see a psychiatrist, and told **OFFICER RUSSO** that he wanted to kill himself, but was ignored and humiliated by **OFFICER RUSSO** (Missing Disc Discovery, Exhibit "I").

55.   The statements of the inmates include that when **MULLIN** requested to see a "psych," that **OFFICER RUSSO** refused access, stated that "he was beat" and to "go ahead and hang yourself," that "you have to wait until the holidays are over to see the psych because they won't be back until the holidays are over," that **MULLIN** was "clearly distressed" and was told by **OFFICER RUSSO** to "Shut up.  You might as well kill yourself, "and that "there was no psych available " so "I guess you have to kill yourself" (Missing Disc Discovery, Exhibit "I").

56.   Several inmates stated that **MULLIN** requested to see a psychologist (Missing Disc Discovery, Exhibit "I").

57.   An inmate heard **MULLIN** banging on a wall and asking to see a psychologist (Missing Disc Discovery, Exhibit "I").

58.    Two inmates heard **OFFICER RUSSO** say "if you want to kill yourself, kill yourself" (Missing Disc Discovery, Exhibit "I").

59.    Another inmate said "last night I heard the guy that died ask for the psych last night it on 2nd shift and he was denied by CO Russo.  I'll take a polygraph if you ask" (Missing Disc Discovery, Exhibit "I"**).**

60.    **OFFICER RUSSO** refused and failed to attend to or assist **MULLIN,** responding instead that "I guess you'll have to kill yourself" and "you'll have to wait until after the holidays" (Missing Disc Discovery, Exhibit "I").

61.    One inmate stated that **OFFICER DIMLER** failed to make any rounds at all during his entire shift except once when he started the shift (Missing Disc Discovery, Exhibit "I").

62.    The Shift Commander defendants **CHIEF RALPH YANSEK** and **LT DUDICH,** well as the Supervising Officers **SGTS. STERN** and **SPENCE,** along with **OFFICER RUSSO's** partner, **OFFICER ERIC LARGE,** knew or should have known by reason of the Special Needs Roster and the pleas for assistance by **MULLIN** that **MULLIN** required special precautions and monitoring, that he was at risk for suicide, was going to attempt suicide and required immediate and emergent mental health and medical assistance, as well as Constant Watch monitoring (all prior exhibits, policies July 13 discovery).

63. The Shift Commanders **CHIEF RALPH YANSEK** and **LT. DUDICH,** as well as the Supervising Officers **SGTS B. STERN** and **THOMAS SPENCE,** along with **OFFICER RUSSO'S** partner, **OFFICER ERIC LARGE,** knew or should have known by reason of the Special Needs Roster and the pleas for assistance by **MULLIN** that **MULLIN** required special precautions and monitoring, that he was at risk for suicide, was going to attempt suicide and

required immediate and emergent mental health and medical assistance, as well as Close Watch or Constant Watch monitoring.

64.    The Shift Commanders **CHIEF RALPH YANSEK** and **LT. DUDICH**, as well as supervising officers **SGTS. B. STERN** and **THOMAS SPENCE** failed to properly maintain order, permitted and allowed the officers under their supervision to provide lax monitoring in violation of Procedure, including but not limited to failing to conduct Close Watch or Constant Watch of **MULLIN**, failing to document routine checks, and failing to maintain appropriate logs and handling of the inmates.

65.    Defendants **CHIEF YANSEK, SGT. STERN, SGT. SPENCE, SGT. DUDICH, OFFICERS RUSSO, DIMLER** and **LARGE** failed and refused to comply with mandated policy directives and failed and refused to provide the mental health care needed, all a direct and proximate cause of **MULLIN's** death (all prior exhibits, policies July 13 discovery).

66.    Defendants **CHIEF YANSEK, SGT. STERN, SGT. SPENCE, SGT. DUDICH, OFFICERS RUSSO, DIMLER** and **LARGE** were obligated by policy to provide emergency mental health treatment to **MULLIN** and to place him on Constant Watch until properly evaluated (all prior exhibits, policies July 13 discovery).

67.    Defendants **CHIEF YANSEK, SGT. STERN, SGT. SPENCE, SGT. DUDICH, OFFICERS RUSSO, DIMLER** and **LARGE** were obligated by policy to properly document in a log book **MULLIN's** requests for mental health assistance (July 2013 discovery, CM 0425, Exhibit "O").

68.    Defendants **CHIEF YANSEK, SGT. STERN, SGT. SPENCE, SGT. DUDICH, OFFICERS RUSSO, DIMLER** and **LARGE** knew or should have known that as a Special Needs Roster Inmate, clearance was needed by the Mental Health Department prior to placement

in detention, and that prior to such evaluation the inmate, here **MULLIN,** was to be placed on Constant Watch when in a detention unit. Defendants exhibited gross indifference and reckless disregard to the serious medical needs of plaintiff's decedent in failing to abide by policy and procedure, and by failing to take action despite direct or constructive knowledge of the risk for suicide of plaintiff's decedent (July 2013 discovery, CM 0425, Exhibit "O"; Plaintiff's designation as special needs unknown until Missing Disc Discovery obtained).

69.   **CHIEF YANSEK, SGT STERN** and **SGT THOMAS** allowed, permitted and acquiesced in a pattern, practice and custom of lax monitoring and supervision, inadequate recordkeeping, failure to provide medical attention and proper care to inmates, improper logbook entries which did not accurately reflect the activities of the Officers under their command and the requested needs of inmates, and permitted and allowed an atmosphere to exist that allowed the gross misconduct and violations the civil rights of plaintiff's decedent committed b**y OFFICERS RUSSO, DIMLER and LARGE.**

70.   **CHIEF YANSEK, SGT STERN** and **SGT. SPENCE** permitted, allowed, acquiesced in an unofficial custom and policy that permitted Officers to fail to follow policy with impunity, and to conspire with each other to deny and cover misconduct.

71.   **CHIEF YANSEK, SGT STERN, SGT. SPENCE, OFFICER DIMLER, OFFICER RUSSO** and **OFFICER LARGE** knew or should have known of the history of suicide and psychiatric illness suffered by **MULLIN** as herein described, knew or should have known based on the Special Needs Roster and charting history that **MULLIN** was an addict and required one on one constant supervision as he was at high risk for suicide and/or self-inflicted harm.

72.   **CHIEF YANSEK, SGT STERN, SGT. SPENCE, OFFICER DIMLER, OFFICER RUSSO and OFFICER LARGE** knew that policy and procedure required direct and constant supervision and monitoring, and yet failed to abide by said policy and procedure, evidencing a gross indifference to the welfare of **MULLIN.**

73.   **CHIEF YANSEK, SGT. STERN, SGT. SPENCE, OFFICER DIMLER, OFFICER RUSSO** and **OFFICER LARGE** permitted **MULLIN** to be in a cell with materials, such as bedsheets, which are known to be used by inmates at risk to harm themselves, including the committing of suicide, in violation of procedure, policy and protocol.

74.   Nurse Beatrice Teel was summoned to assist decedent after he was found unresponsive.

75.   Decedent was pronounced dead at 4:49 AM.

76.   During all relevant times between January 15, 2009 and the time and date of death on January 17, 2009, decedent plaintiff was under the custodial care of **JANE BYRD, L.P.N, OFFICER NICHOLAS DIMLER, OFFICER ROBERT RUSSO, CHIEF RALPH YANSEK, Lt. DUDICH, SGT. B. STERN, SGT. THOMAS SPENCE, OFFICER ERIC LARGE, KINTOCK GROUP.**

77.   The original death certificate states the place of death as Trenton Psychiatric Hospital; the records from the DOC indicate plaintiff's location at death was in either South Woods State Prison or C.R.A.F., and the amended death certificate identifies the location of death as C.R.A.F.  A detective informed plaintiff that her son, plaintiff's decedent, had died at Trenton Psychiatric Hospital.

78.   On January 16, 2009, defendant **JANE BYRD, L.P.N**. acting under color of law in their personal and individual  capacities as employees, agents and servants of the subject state

16

correctional facility and/or as individual medical providers contracted to work in the correctional facilities, undertook to examine and evaluate plaintiff's decedent.

79.    Decedent's medical record obtained from the DOC reflects numerous entries from 2005 until his death evidencing his past suicide attempts, his diagnosis as a suicide risk, his family history of suicide, his history of mental illness including anxiety, depression and mood disorder, and his use of psychotropic medication for his psychiatric conditions.

80.    On several occasions, the record reflects that decedent answered "yes" to the question "have you ever been hospitalized or treated for psychiatric illness", and "have you ever considered or attempted suicide".

81.    Specific entries in the medical record include: On August 19, 2005, the decedent Robert Mullin stated during the nursing intake that he had considered or attempted suicide, and that in April 2005 he had attempted suicide. The notes on that date also reflect that the decedent was taking "psych medications."

82.    On September 26, 2007, during a nursing intake, the decedent answered "yes" to the question "have you ever been hospitalized or treated for psychiatric illness," and "have you ever considered or attempted suicide." The notes on that date reflect again that decedent was taking "psych medications."

83.    On September 28, 2007, notes in the medical record reflect that decedent had a diagnosis of a mood disorder.

84.    On October 3, 2007, notes in the medical record reflect that that decedent had a diagnosis of a mood disorder, and he was taking the psychotropic medication Doxepin, and he was referred to "Mental Health."

85.    On November 16, 2007, and on at least seven other occasions in the following two-plus years until decedent's death, notes in the medical records reflect the diagnosis of "mood disorder," a family history of suicide, and a history of being a suicide risk.

86.    At least one of these entries details that the decedent was being treated for a psychiatric illness, namely depression and anxiety.

87.    On January 14, 2009, three days before decedent's death, the medical record reflects that the inmate was seen at South Woods State Prison, following a transfer from Kintock to Detention/ECU, and the diagnoses of "mood disorder," a family history of suicide, and a history of being a suicide risk.

88.    On January 16, 2009, an entry in the medical record identifies a "nursing intake" completed by defendant **JANE BYRD, L.P.N.**  During that intake the decedent answered "Yes" to the question "have you ever been hospitalized or treated for psychiatric illness," and to the question "have you ever considered or attempted suicide."  The medical record on that date also includes the diagnoses of "mood disorder," a family history of suicide, and a history of being a suicide risk .

89.    A subsequent entry on January 16, 2009, signed by nurse Erin Marusky, R.N. at 6:26 states the location of care is "Central Reception & Assignment Facility – Main," and the narrative "[inmate] medically cleared for placement on S3 … Erin Marusky, R.N. January 16, 2009 6:25 PM."

90.    Defendant **KINTOCK** failed to advise or notify any representative from the **DOC, SWSP** or **C.R.A.F.** that **MULLIN** was a Special Needs inmate, and that **MULLIN** as an addict, a suicide risk, had a history of tremendous substance abuse, had been tested positive for

opiates and cocaine immediately prior to transfer to their care, and that he required intensive medical care and supervision.

91.   At no time did  defendant **NURSE BYRD** evaluate **MULLIN** for intoxication as was required under policy and procedure.

92.   Said individual defendants failed to adequately evaluate, supervise or monitor plaintiff, which failures were the direct and proximate cause of the self-harm and suicide by **MULLIN.**

93.   As a Mental Health Special Needs inmate, and under the circumstances of his transfer from **KINTOCK** to Southwood State Prison to Trenton Psychiatric Hospital and/or **C.R.A.F.,** and under the circumstances of his detention requiring administrative detention and segregation, policy mandated and required that **MULLIN** be evaluated by a mental health professional prior to being placed in the subject housing unit, and further, policy required that **MULLIN** be placed on Constant Watch and observation prior to a mental health evaluation ( all prior exhibits, Missing Disc Discovery identification as Special needs, policies from July 2013 discovery).

94.   Defendants failed and refused to follow policy and **MULLIN** did not receive the proper mental health evaluation, treatment and monitoring mandated by policy, being a direct and proximate cause of his suicide and death.

95.   On January 17, 2009 an entry in the medical record identified the event as "internal other: death of inmate."  This entry shows that nurse Teel was with an unnamed officer in the hallway on the floor at 4:24 AM, and CPR was performed by unnamed officers or medical providers, at which time the decedent was unresponsive.  The unnamed officer was **OFFICER DIMLER.**

96.   A further entry in the record on Jan. 17, 2009, signed by Nurse Teel, identifies the event as "Emergency Report: Medical Emergency for code 66/late entry" repeats the entry, and adds a diagnosis list, including the history of mood disorder, family history of suicide, and that decedent was a suicide risk.

97.   Despite a known history of decedent's suicide attempts, anxiety, depression and psychiatric instability, as well as a recent history of addiction and drug use, all of the defendants on Jan. 16 and 17, 2009 failed to provide adequate protection and supervision to decedent in the hours leading up to decedent's suicide and failed to intervene to prevent the suicide.

98.   The report on the medical chart from the Licensed Clinical Social Worker, stating that plaintiff's decedent had psychological problems and was requesting mental health treatment and medication, and that he was positive for cocaine and opiates, should have alerted defendant **NURSE BYRD** that **MULLIN** was a suicide risk requiring special protocol and precautions, none of which occurred.

99.   **OFFICER DIMLER** last observed decedent at 3:50am on January 17, 2009, and found him dead at 4:23am, a half hour later, as set forth in the autopsy report, and/or failed to observe him at all throughout his shift, as stated by an inmate (Missing disc, Exhibit "I," SAC para. 25, autopsy report).

100.   The policy regarding observations at either 15 minute intervals or on a continuous observation/monitoring status applied to decedent in the Housing Unit to which he was assigned, since he was identified by a health provider as requiring special services (Missing Disc on identification as Special Needs; policies July 2013).

101.   **CHIEF YANSEK, LT DUDICH, SGT STERN, SGT. SPENCE, OFFICER DIMLER, OFFICER RUSSO** and **OFFICER LARGE** had actual knowledge and notice that

decedent was a suicide risk and needed special care, monitoring and supervision, and knew that there was a strong likelihood of self-inflicted harm in the event that they failed to provide emergent care.

102.   **JANE BYRD** was required by policy and procedure to conduct a Mental Health Evaluation utilizing a Suicide Risk Assessment Form, which she failed to do.

103.   **JANE BYRD** was required by policy and procedure to provide an immediate referral to the mental health department and see to it that decedent be assessed by a mental health staff member prior to being transferred to the subject Housing Unit, policies which were not followed.

104.   **JANE BYRD** was required by policy and procedure to obtain an immediate mental health screen so that the need for particular suicide precaution could be assessed, which was not done.

105.   All the named defendants failed to follow policy and protocol when they failed to notify the mental health department and see to it that decedent would be placed on Constant Watch during the late evening/early morning hours when a psychologist or psychiatrist was not available to evaluate decedent as required, and/or failed to properly supervise their subordinates with regards to same.

106.   The failures on the part of the defendants to follow set guidelines and procedures for the management of inmates needing mental health care, including **MULLIN,** were a direct and proximate cause of his damages and death.

107.   Plaintiff's decedent had a known and documented history of suicide attempts and psychiatric disturbance dating from 2005, 2007, 2008 and 2009 up to and including his final evaluation prior to his death, which was known to, and should have been known to, the

defendants **JANE BYRD, OFFICERS DIMLER, RUSSO, LARGE, CHIEF YANSEK,  LT DUDICH, SGTS STERN, SGT. SPENCE** and **KINTOCK**.

      a.    Plaintiffs **JOAN MULLIN, as Administratrix Ad Prosequendum of the Estate of ROBERT MULLIN, JR.,** and **JOAN MULLIN, individually**, institute this action for compensatory and punitive damages arising out of the unlawful actions and conduct of the defendants **JANE BYRD, L.P.N, CHIEF YANSEK, LT. DUDICH, SGT. STERN, SGT. SPENCE,  OFFICER DIMLER, OFFICER RUSSO, OFFICER LARGE, KINTOCK, JOHN DOES 9-10** and **ABC ENTITIES 1-10** in violating the civil rights of plaintiff's decedent protected by and secured under the provisions of the First, Fourth, Eighth  and Fourteenth amendments to the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1985.

      108.    At all relevant times herein, defendants **JANE BYRD, L.P.N**. in her personal and individual capacities, **ERIN MARUSKY, R.N,** in her personal and individual capacities, **CHIEF YANSEK**, in his personal and individual capacities, **LT. DUDICH** in his personal and individual capacities, **SGT. STERN** in his personal and individual capacities, **SGT. SPENCE** in his personal and individual capacities, **OFFICER DIMLER,** in his personal and individual capacities, **OFFICER RUSSO** in his personal and individual capacities, **OFFICER LARGE** in his personal and  individual capacities,  **KINTOCK, JOHN DOES 9-10** in their personal, individual and official capacities, and **ABC ENTITIES 1-10** were acting under color of state law and within the scope of their authority as agents, servants and employees of said defendants.

      109.    Plaintiffs also institute this action pursuant to the laws of the State of New Jersey for damages arising by reason of wrongful death, pain and suffering, hedonistic damages,