**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————  :
  :
JOAN MULLIN,  :
  :
              Plaintiff,  :     Civil Action No. 11-247 (FLW) (LHG)
  :
    v.  :
  :       **OPINION**
KAREN BALICKI, et al.,  :
  :
           Defendants.  :
———————————————————  :

**WOLFSON, Chief United States District Judge**:

Pending before the Court is a motion to dismiss filed by Defendants Officer Nicholas Dimler, Officer Robert Russo, Officer Eric Large ("Officer Defendants") and Chief Ralph Yansek, Lt. Dudich, Sgt. B. Stern, and Sgt. Thomas Spence ("Supervisor Defendants") (collectively, "Moving Defendants").[1] This case, arising out of a jailhouse suicide, was originally assigned to the Hon. Mary Little, U.S.D.J., but was reassigned to me on November 30, 2017. Plaintiff Joan Mullin ("Plaintiff") brought this suit against Moving Defendants, Nurse Jane Byrd, and Kintock Group,[2] as administrator of the estate of her son, Robert Mullin ("Robert"), who committed suicide while he was housed in a cell at the Central Reception and Assignment

———————————————————

[1] The motion to dismiss was initially filed on behalf of Defendants Dimler, Dudich, and Stern only. On December 3, 2018, counsel for these defendants informed the Court that he had begun representing Defendants Spence, Large, Russo, and Yansick as well, and that these defendants would join the pending motion to dismiss. *See* ECF No. 293.

[2] Nurse Byrd was granted summary judgment by Order dated May 25, 2016, and was dismissed from the case. Kintock Group has also since settled with Plaintiff.

Facility ("CRAF"), a correctional facility operated by the New Jersey Department of Corrections ("NJDOC").

Moving Defendants currently seek dismissal of Plaintiff's Third Amended Complaint ("TAC"), which alleges that Moving Defendants (1) violated Robert's First, Fourth, Eighth, and Fourteenth Amendment rights under the United States Constitution (Count I); (2) violated rights secured to Robert under Articles I and XII of the New Jersey Constitution (Count II); (3) were negligent (Count III); (4) caused Robert to experience emotional distress (Count IV); (5) engaged in abuse of process/abuse of authority (Count V); and (6) entered into a civil conspiracy against Robert (Count VII).

For the following reasons, Moving Defendants' motion is granted as to Counts V and VII, and denied as to Counts I, II, III, and IV, except that Counts I and II are granted as to Supervisor Defendants only.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff's claims arise from the tragic jailhouse suicide of her son, Robert, on January 17, 2009. TAC at ¶ 47.  Robert was a drug addict with a history of narcotics abuse and suicide attempts. *Id.* at ¶ 25. Medical records obtained from the NJDOC revealed that Robert was diagnosed as a suicide risk, had a family history of suicide, a history of mental illness including anxiety, depression and mood disorder, and used psychotropic medication for his psychiatric conditions.  *Id.* at ¶ 79.

On or about January 15, 2009, while awaiting his imminent release from the Kintock halfway house, Robert exhibited mental deterioration, including aggressive behavior, and he swallowed a handful of pills (later identified as depression medications) in front of a caseworker

at Kintock, then threw the rest of the pills in a trash can. *Id.* at ¶ 17. Robert was later found to be in possession, and under the influence of, controlled substances, including cocaine and opiates. *Id.* at ¶¶ 15-17.

As a result, Robert was moved to South Woods State Prison, a correctional facility, where he underwent a medical evaluation. *Id.* at ¶¶ 18-19. A Licensed Social Worker at South Woods identified Robert as a Mental Health Special Needs Inmate, *i.e.* an inmate suffering from a psychiatric condition who is "unable to meet the functional requirements of incarceration without mental health treatment" in accordance with stated NJDOC Policy ("the Policy"), and constitutes a potential suicide risk. *Id.* at ¶ 26.

After the medical evaluation at South Woods, Robert was transferred to the CRAF on January 16, 2009. *Id.* at ¶ 89. Robert's Special Needs designation was noted on a transfer sheet sent from South Woods to CRAF as part of Robert's electronic medical records. *Id.* at ¶ 28. Upon transfer, Robert was evaluated by Nurse Byrd. During that intake, Robert answered "Yes" to the question "have you ever been hospitalized or treated for psychiatric illness," and to the question "have you ever considered or attempted suicide." *Id.* at ¶ 88. In accordance with policy, Robert was placed on the Special Needs Roster available to all monitoring, housing, supervisory and medical personnel, and was transferred to a Close Custody Unit, Housing S3. *Id* at ¶¶ 31-32, 36. Despite this, Robert was not referred to psychiatric evaluation, which was also required by the Policy. *Id.* at ¶¶ 36-40.

Officers Dimler, Russo and Large, the individual corrections officers on duty in the Close Custody Unit, were responsible for the care, treatment, supervision and monitoring of Robert. *Id.* at ¶¶ 48-49. Each of these officers covered different shifts on the night of the incident. *Id*. Chief

Yansek, Lt. Dudich, Sgt. Stern and Sgt. Thomas were the supervisory and commanding officers on duty responsible for overseeing the Officer Defendants. *Id.* at ¶ 51. According to the TAC, the Policy requires high levels of monitoring and supervision in the Close Custody Unit for Special Needs inmates, consisting of either "Close Watch"— intermittent monitoring of an inmate either in person or by video monitoring at 15 minute intervals—or "Constant Observation"— uninterrupted observance of one inmate to be conducted in person or by video monitor when the video monitor provides continuous unobstructed vigilance. *Id.* at ¶ 38.  Upon transfer, a psychologist or psychiatrist is also required to conduct an initial assessment and complete a suicide watch notice. *Id* at ¶ 44. If a mental health professional is not available due to the time of the transfer after business hours, then the prisoner must be under Constant Observation until an appropriate evaluation is made. *Id.* Also in accordance with the Policy, a determination must be made as to what items will be permitted in the cell, including blankets or sheets. *Id.* at ¶ 45

According to the TAC, all of the Moving Defendants were also obligated by policy to know which inmates under their watch were designated Special Needs on the Special Needs Roster, and, in fact, had direct knowledge that Robert was a Special Needs inmate requiring special precautions and monitoring. *Id* at ¶ 52. The TAC alleges that, despite this knowledge and in violation of the Policy, Officer Defendants failed to monitor Robert either on Constant Observation or Close Watch. *Id.*

According to the reports of inmates housed near Robert, Officer Dimler made only one round over the course of his entire shift. Inmates also reported that Officer Russo made several troubling statements to Robert in response to Robert's request to see a psychiatrist. *Id.* at ¶ 61.

Officer Russo allegedly told Robert to "go ahead and hang yourself" because "you have to wait until the holidays are over to see the psych because they won't be back until the holidays are over." *Id.* at ¶ 55. In responses to Robert's obvious distress, Officer Russo allegedly told Robert to "Shut up. You might as well kill yourself," and that "there was no psych available" so "I guess you have to kill yourself." *Id.* Moreover, an inmate heard Robert banging on a wall and asking to see a psychologist, and another inmate stated "last night I heard the guy that died ask for the psych…on 2nd shift and he was denied by CO Russo. I'll take a polygraph if you ask." *Id.* at ¶ 59. On January 17, 2009 at approximately 4:23 a.m., Officer Dimler found Robert unresponsive, hanging from a noose made of a bed sheet. *Id.* at ¶ 47. Officer Dimler performed CPR, but failed to revive Robert. *Id.* at ¶ 95.

This case has been the subject of over eight years of litigation. Plaintiff filed the initial complaint on January 14, 2011, which was originally assigned to Judge Little, against several parties, most of whom have since been dismissed: the State of New Jersey, and several individual administrators and health care providers at the jail facilities. The matter was also settled with Kintock, and Mercer County was voluntarily dismissed from the case. Nurse Byrd was granted summary judgment by Order dated May 25, 2016. Plaintiff twice amended her complaint to both flesh out the facts—in part to account for interim discovery she received—and to modify the list of defendants. In particular, Plaintiff filed the Amended Complaint ("SAC"), adding Officer Dimler as a Defendant in September 2012. After a series of discovery disputes, in April 2013 the State supplied a Special Investigation Report detailing reports from inmates that Robert had been crying out for help and was ignored; however, due to a clerical error, Plaintiff's attorney failed to review this material when it was received, and Judge Little ultimately

dismissed the SAC as to all Defendants in November 2013. After dismissal, in February 2014, Plaintiff's counsel discovered the overlooked material, and filed a motion to amend, which the Magistrate Judge denied. Upon appeal, the Third Circuit reversed the denial of leave to amend and permitted Plaintiff to file the TAC. The case was reassigned to me on November 30, 2017, and the TAC was filed on January 25, 2018.

On October 26, 2018, Defendants Dimler, Dudich and Stern moved for dismissal, arguing that the TAC should be dismissed on the following grounds: 1) failure to state a claim for conspiracy under 42 U.S.C. § 1985; 2) that the New Jersey Tort Claims Act ("NJTCA") provides immunity from Plaintiff's state law claims; 3) failure to state a claim for abuse of process/abuse of authority; 4) failure to state a claim for civil conspiracy under New Jersey state law; and 5) that qualified immunity applies to Plaintiff's constitutional claims. On December 3, 2018, Defendants Russo, Large, Spence and Yansek joined the pending motion.

## II.  **LEGAL STANDARD**

Moving Defendants move to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6). Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "[f]ailure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under this standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

Under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

## III.    DISCUSSION

Moving Defendants move to dismiss on the following grounds: 1) qualified immunity bars all § 1983 claims (and parallel NJCRA claims) against Moving Defendants in their individual capacities; 2) Plaintiff has failed to state a claim for conspiracy under Federal and New Jersey law; and 3) Plaintiff's state tort claims should be dismissed due to NJTCA immunity or failure to state claim. I will address each of these arguments in turn.

### A.   Qualified Immunity - § 1983 Individual Capacity Claims Against Moving Defendants

Moving Defendants argue that the doctrine of qualified immunity shields them from Plaintiff's Count I, for violation of Robert's Constitutional Rights in connection with his jail cell suicide. "Qualified immunity is 'an entitlement not to stand trial or face the burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Under this doctrine, a government official is immune from claims for damages unless, interpreting the allegations most favorably to the plaintiff, they show (1) that the official violated the plaintiff's constitutional or statutory rights and (2) that the rights violated were clearly established. *Id.* at 201; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known."). While courts generally address the first prong—whether a constitutional violation is alleged—first, a court may exercise discretion in considering these elements in the order it sees fit. *Pearson v. Callahan*, 555 U.S.

223, 236 (2009). Qualified immunity applies only to defendants in their individual capacities.
*Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 572 n.151 (3d Cir. 2017).

As an initial matter, with regard to the second prong of the qualified immunity analysis, there is no dispute that the right at issue is clearly established. Prison officials have a Constitutional "obligation not to act with reckless indifference to a prisoner's vulnerable mental state when the officials know or should know of that prisoner's suicidal tendencies." *Snyder v. Baumecker*, 708 F. Supp. 1451, 1460 (D.N.J. 1989) (citing *Freedman v. City of Allentown, Pa.*, 853 F.2d 1111, 1115 (3d Cir. 1988); *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) ("*Colburn I*")).[3] This is precisely the right Plaintiff alleges Moving Defendants violated here: that Robert had a particular vulnerability to suicide of which Defendants should have been aware, and that Defendants acted with reckless indifference to this known risk. Thus, the

---

[3] Count I also asserts that Moving Defendants violated the following Constitutional rights: the "First Amendment right to be free of retaliation or abuse based on the request for mental health assistance" and the "14th Amendment right to equal protection, based on discrimination in failing to offer mental health treatment." ECF No. 294 at 30. To the extent that these constitute separate claims, they are dismissed for the following reasons. As an initial matter, a vulnerability to suicide claim brought by an inmate—which is the focus of Plaintiff's opposition brief—is properly analyzed under the Eighth Amendment, except for claims brought by pretrial detainees which are brought under the Fourteenth Amendment due process clause. *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017). Further, in order to assert a First Amendment retaliation claim, Plaintiff must as a threshold issue demonstrate that he engaged in constitutionally protected conduct. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Here, the only plausible constitutionally protected conduct is Robert's request to Officer Russo to see a psychiatrist. However, while the filing of official grievances regarding medical care constitutes protected activity, Plaintiff does not cite any cases—and the Court is unaware of any—in which the mere verbal request for medical care by a prisoner constitutes protected activity for the purposes of a First Amendment retaliation claim. *See, e.g. Wicker v. Shannon*, No. 09-629, 2010 WL 3812351, at *6 (M.D. Pa. Sept. 21, 2010) (although filing of grievance form is protected conduct, merely requesting one is not); *Hunter v. Bledsoe*, No. 10-0927, 2010 WL 3154963, at *4 (M.D. Pa. Aug. 9, 2010) (same). Moreover, to the extent that Plaintiff asserts an equal protection claim, he has not identified a protected class to which he belongs.

question is whether Moving Defendants violated that right. As this question requires a different analysis for both Officer Defendants and Supervisor Defendants, I will address each of these sets of defendants separately.

1. Officer Defendants

Plaintiff brings claims against the three Officer Defendants who were on duty in the Close Custody Unit on the night of Robert's suicide, and who were allegedly directly responsible for monitoring Robert. The Eighth Amendment, which is made applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. "[D]eliberate indifference to serious medical needs of prisoners" constitutes a violation of that constitutional proscription. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Third Circuit has held that a prisoner's vulnerability to suicide is one such serious medical need. Thus, to assert an Eighth Amendment claim for deliberate indifference to a prisoner's vulnerability to suicide, a Plaintiff must allege the following: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017); *see also Colburn I*, 838 F.2d 663; *Colburn v. Upper Darby Township* ("*Colburn II*"), 946 F.2d 1017 (3d Cir. 1991); and *Woloszyn v. County of Lawrence*, 396 F.3d 314 (3d Cir. 2005).

At this stage, Plaintiff has satisfied the first prong, that Robert had a particular vulnerability to suicide. The Third Circuit has explained that an individual's particular

vulnerability to suicide "speaks to the degree of risk inherent in the detainee's condition." *Palakovic,* 854 F.3d at 222 (quoting *Colburn II*, 946 F.2d at 1024). A prisoner's "strong likelihood" of suicide "must be 'so obvious that a lay person would easily recognize the necessity for' preventative action." *Id.* (quoting *Colburn II*, 946 F.2d at 1025). Plaintiff alleges that Robert had a history of suicide attempts, diagnoses as a suicide risk, a familial history of suicide, a history of mental illness including anxiety, depression and mood disorder, and use of psychotropic medication. Plaintiff further alleges that immediately prior to transfer to the DOC facilities—two days before his death—Robert had swallowed a handful of depression medication pills in front of a caseworker at Kintock. This documented history of suicidal behavior clearly indicates that there was a "strong likelihood, rather than a mere possibility that self inflicted harm would occur." *Woloszyn*, 396 F.3d at 322 (quoting *Colburn II*, 946 F.2d at 1024) ("[W]hen a mentally ill, depressed person has attempted to kill himself multiple times, has engaged in self-harm… it cannot be said as a matter of law that the risk of suicide is nothing more than a 'mere possibility.'"). Moreover, Plaintiff avers that various neighboring inmates had heard Officer Russo recognizing Robert's suicidal desires, by allegedly taunting Robert, "if you want to kill yourself, kill yourself'." *See Colburn II*, 946 F.2d at 1025 (holding that there is a "strong likelihood" where a lay person would recognize the necessity for preventive action). Taken together, these allegations indicate that Robert had a particular vulnerability to suicide.

Further, there is no question as to the second prong of the analysis, that Officer Defendants knew, or, at the very least should have known, of Robert's particular vulnerability to suicide. Officer Russo had actual knowledge of Robert's vulnerability, as several inmates stated that Robert told Officer Russo that he wanted to kill himself and begged to see a psychiatrist, and

that Officer Russo acknowledged these pleas. While Plaintiff does not allege that Officers Dimler and Large had direct, subjective knowledge of Robert's suicidal tendencies, "[i]t is not necessary for the custodian to have a subjective appreciation of the detainee's particular vulnerability." *Palakovic*, 854 F.3d at 231 (citing *Woloszyn*, 396 F.3d at 320). Rather, prison officials may "know" of a particular vulnerability to suicide where they have knowledge of a history of suicide attempts or a diagnosis identifying suicidal propensities, which can be presumed if all of this information is accessible in the prisoner's records. *Id.* at 230-31. At the time of transfer to CRAF, Robert was allegedly placed on the Special Needs Roster, reserved for an inmate suffering from a psychiatric condition who is "unable to meet the functional requirements of incarceration without mental health treatment," and is a suicide risk. According to Plaintiff, Robert's suicidal history was noted in the records, and in his intake form, he admitted to having attempted suicide in the past. "These facts, taken together, are sufficient to support a reasonable inference that prison officials and medical personnel knew or should have known of [Robert's] particular vulnerability to suicide." *Id.* ("Brandon had attempted suicide on prior occasions and told prison officials so. The prison identified Brandon as a 'suicide behavior risk' and rated him 'Stability Rating D,' diagnosed him with multiple, serious mental illnesses known to heighten the risk of self-harm, and placed him on the 'mental health roster.' The Palakovics allege that all of this information was set forth in Brandon's records, which the corrections officers and medical staff must have—or, at the very least, should have—reviewed….").

Finally, having determined that Officer Defendants had actual or constructive knowledge of Plaintiff's vulnerability, I next turn to whether they were deliberately indifferent to such risk.

When assessing whether a defendant showed deliberate indifference to a prisoner's risk of or vulnerability to suicide, the Third Circuit has looked to the definition of that term derived from *Farmer v. Brennan*, 511 U.S. 825 (1994), which demands "something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Palakovic*, 854 F.3d at 231 (citing *Woloszyn*, 396 F.3d at 320). Thus, an "official knows of and disregards an excessive risk to inmate health or safety" when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Allen v. Cumberland Cty.*, No. 15-6273, 2018 WL 1293154, at *8 (D.N.J. Mar. 13, 2018) (citing *Farmer*, 511 U.S. at 834). As an initial matter, there is again no doubt that Plaintiff has alleged that Officer Russo acted with deliberate indifference to the risk of Robert's vulnerability to suicide: Robert told Officer Russo that he wanted to kill himself, but Officer Russo ignored and humiliated him, and even encouraged Robert to "go ahead and hang yourself." TAC at ¶¶ 54-60. As for the remaining Officer Defendants—Officers Dimler and Large—it is enough that Plaintiff has alleged that they had awareness of Robert's vulnerability to suicide, which they recklessly disregarded. Indeed, at the motion to dismiss stage, courts have found that prison officials acted with reckless indifference to a prisoner's particular vulnerability to suicide when, as here, they ignore "positive answers to relevant medical intake questions, or otherwise obvious indicators of suicidality." *Estate of Allen*, 2018 WL 1293154, at *8 (citing, *e.g., Palakovic*, 854 F.3d at 230; *Colburn I*, 838 F.2d at 670). Here, Plaintiff alleges that Robert positively answered medical intake questions indicating suicidality, and, otherwise, outwardly expressed his suicidal intentions. Despite this, Officer Defendants allegedly failed to adequately

monitor Plaintiff, and even permitted him to have bed sheets, the tools that Robert ultimately used to end his own life. These allegations are sufficient to survive a motion to dismiss.

In response, Moving Defendants merely argue that Officer Defendants are not medical professionals, but "officers of the law who maintain order in a correctional facility and conduct their duties to the best of their ability." ECF No. 287-1 at 23. According to Moving Defendants, the fact that Officer Dimler attempted to save Robert's life by administering CPR indicates that Plaintiffs were doing their best to ensure Robert's safety, but ultimately failed. *Id.* However, the obligation not to act with reckless indifference to a prisoner's vulnerable mental state extends beyond medical professionals to any prison official who recklessly disregards a known risk of a particular vulnerability to suicide. *See Boyd v. Bergen Cty. Jail*, No. 07-769, 2012 WL 3821890, at *16 (D.N.J. Sept. 4, 2012), *aff'd sub nom.*, 536 F. App'x 203 (3d Cir. 2013) (noting that prisoner's Eighth Amendment claims against prison guards "are subject to the same deliberate indifference standard as his claims against medical personnel"). And, officers are not absolved from liability even if they attempt lifesaving procedures when a prisoner successfully attempts suicide as a result of the officers' deliberate indifference to a known risk. If I were to adopt Moving Defendants' position, it would run directly contrary to reason and established law.

Thus, because Plaintiff has adequately alleged that Officer Defendants violated Robert's Eighth Amendment rights, qualified immunity does not shield Officer Defendants from Plaintiff's Constitutional claims.

　　2.　Supervisory Liability

Supervisor Defendants are not alleged to have been personally responsible for monitoring Robert while he was in the Close Custody Unit. Nevertheless, Plaintiff alleges that Supervisor

Defendants were responsible for the unreasonable and dangerous practice of failing to ensure that Officer Defendants were adequately monitoring Robert, including by not maintaining log books documenting the Officer Defendants' rounds. Because vicarious liability and *respondeat superior* are not actionable under § 1983, Plaintiff must show that Supervisor Defendants violated Robert's constitutional rights. *See Estate of Moore v. Cumberland Cty.,* No. 17-2839, 2018 WL 1203470, at *2 (D.N.J. Mar. 8, 2018). The Third Circuit has recognized that there are two theories of supervisory liability. First, supervisors can be held indirectly liable if they established and maintained a policy, practice or custom which itself directly caused the constitutional harm. *Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010); *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).[4] Second, they can be directly "liable if they participated in violating a plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Id.* A plaintiff "can show this by establishing that the risk was obvious." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 135 (3d Cir. 2001). Here, although it is not entirely clear which method of supervisory liability Plaintiff asserts, the TAC does not adequately allege that Supervisor Defendants may be liable under either method.[5]

---

[4] The Third Circuit has since questioned whether a supervisor may be held indirectly liable for deficient policies using this first method—the so-called *Sample* test—"as the Supreme Court may have called the…test into question in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Palakovic*, 854 F.3d at 225. Nonetheless, as explained *infra*, Plaintiff has failed to adequately allege supervisory liability under either method.

[5] In her opposition brief, Plaintiff also makes reference to a *Monell* claim, under which a governmental entity may be held directly liable for establishing an unconstitutional policy, practice, or custom. However, as no governmental entity is a party to the suit, Plaintiff has no basis to assert such a claim.

As for the first method, Plaintiff argues only that Supervisor Defendants "knew the policy regarding the level of supervision required" for suicide risk inmates, yet failed ensure that this policy was carried out. Under Third Circuit law,

> [t]o hold a supervisor liable for such an Eighth Amendment violation, the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and [allege] that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure

*Sample*, 885 F.2d at 1118. Under this test, "to establish a claim against a policymaker under § 1983 a plaintiff must allege and prove that the official established or enforced policies and practices directly causing the constitutional violation." *Chavarriaga v. New Jersey Dep't of Corrs.*, 806 F.3d 210, 229 (3d Cir. 2015). Here, the problem with Plaintiff's attempt to hold Supervisor Defendants liable is that she has neither clearly articulated the precise policy, practice, or custom at issue, nor has she alleged who implemented one. Although a plaintiff could theoretically allege an Eighth Amendment violation based on a widespread policy, practice, or custom of failing to ensure that suicide risk inmates were effectively monitored, Plaintiff's vague allegations here do not suffice: there is no indication about how prevalent the practice is, nor who was responsible for implementing it. Moreover, Plaintiff merely alleges that Supervisor Defendants were on duty while Officer Defendants failed to adequately monitor Robert, but does not allege any awareness of the alleged failure to monitor.

Indeed, Plaintiff's approach to establishing supervisory liability is similar to one that the Third Circuit rejected in *Parkell v. Danberg*. There, a plaintiff-prisoner brought a § 1983 claim against supervisory prison officials, alleging that they deprived him of adequate medical care by allowing prison staff to subject him to the allegedly unconstitutional practice of visual cavity body searches. *Parkell*, 833 F.3d at 319-20. The Third Circuit disagreed, noting that the plaintiff had not shown "any involvement [by the supervisor] in establishing or enforcing any specific policies…or even any awareness that the searches were occurring." *Id.* at 331. It was, moreover, "unclear whether [the alleged policy] was in accordance with official DOC policy endorsed by [the supervisor], a policy limited to VCC, or even just an informal practice or custom." *Id.* Here, Plaintiff has similarly failed to allege any involvement by Supervisor Defendants in the monitoring decisions, or whether such decisions amounted to official policy or informal practice or custom. As in *Parkell*, to presume that the alleged lax monitoring "arose from [Supervisor Defendants'] policies merely because of [their] position[s] is to rely on *respondeat superior*." *Id.*

Plaintiff likewise cannot establish supervisory liability through the second method—direct liability based on acquiescence to a known obvious risk. Under this method, a plaintiff must show that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety, which can be established by showing that the risk was obvious. *Beers-Capitol*, 256 F.3d at 135. The essence of this method of supervisory liability is the following: "Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in…the subordinate's conduct." *Laurier v. D'Ilio*, No. 15-6043, 2018 WL 638747, at *6 (D.N.J. Jan. 31, 2018) (quoting *Bennett v. Washington,* No. 11–

176, 2015 WL 731227, at *11 (E.D. Pa. Feb. 19, 2015)). Here, although Plaintiff has vaguely and conclusorily alleged that Supervisor Defendants were on duty while Officer Defendants failed to perform their monitoring duties, and, therefore, had the required knowledge, there is no indication that Supervisor Defendants had any actual awareness of this alleged constitutional violation. With only conclusory allegations regarding Supervisory Defendants' knowledge, Plaintiff's attempt to assert supervisory liability cannot survive a motion to dismiss. *See id.* at *8 (granting motion to dismiss against supervisory prison officials for failure to provide adequate medical care because plaintiff did "not allege [supervisors] knew [plaintiff] would be denied adequate medical care in PHD; nor does he allege they knew he was not having his bandages changed as directed by the hospital, or that they knew of any of the other allegedly filthy conditions in PHD").

Thus, because Plaintiff has failed to adequately allege supervisory liability, qualified immunity bars Plaintiff's § 1983 claims against Supervisor Defendants.

## B. NJCRA Claims

In Count II, Plaintiff also asserts that Moving Defendants violated his rights under the NJCRA. The NJCRA was modeled after § 1983, and, thus, courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443–44 (D.N.J.2011); *Chapman v. New Jersey*, Civ. No. 08–4130, 2009 WL 2634888, *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart ...."); *Armstrong v. Sherman,* Civ. No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."). Accordingly, Plaintiff's New Jersey State Constitution

claim will be interpreted analogously to his § 1983 claim. *Trafton*, 799 F.Supp.2d at 443–44; *Bayete v. Ricci*, 489 F. App'x 540, 543 (3d Cir. 2012) (citing *State v. Ramseur*, 106 N.J. 123, 169 (1987)) (concluding that New Jersey's constitutional provisions concerning cruel and unusual punishment are interpreted analogously to the Eighth Amendment). Because the Court has concluded that qualified immunity bars Plaintiff's parallel Eighth Amendment § 1983 claims against Supervisor Defendants but not against Officer Defendants, the same conclusion applies to Plaintiff's NJCRA cause of action.

### C. Civil Rights Conspiracy

The Court will dismiss without prejudice Plaintiff's conspiracy claim under § 1985 for failure to state a claim for relief. Civil rights conspiracies require a "meeting of the minds," and to survive screening or a motion to dismiss, plaintiffs must provide some factual basis to support the existence of the elements of a conspiracy, namely, agreement and concerted action. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). Here, the TAC contains no facts related to a meeting of the minds between Moving Defendants and any of the other parties involved. Although Plaintiff correctly points out that such an agreement may be proven through circumstantial evidence, "pure speculation is not [sufficient]." *Boyd*, 2012 WL 3821890, at *8. Here, Plaintiff offers nothing more than pure speculation that such an agreement between Moving Defendants existed because they were all on duty when Plaintiff was allegedly denied medical care and committed suicide. Thus, this claim must also be dismissed. *See Aulisio v. Chiampi*, No. 17-3301, 2019 WL 1299712, at *3 (3d Cir. Mar. 20, 2019) (dismissing conspiracy claim against state prison officials because inmate-prisoner "offered nothing more than conclusory statements that

Defendants conspired to deprive him of his constitutional rights; no evidence suggests that they agreed, plotted, or even discussed doing so").[6] The conspiracy claim is, therefore, dismissed.

### D. Tort Claims Against Individual Defendants

Plaintiff also asserts three additional common law tort claims against Moving Defendants: negligence (Count III), IIED (Count IV), and abuse of process/abuse of authority (Count V).[7] Moving Defendants, in response, argue that the NJTCA immunizes them from liability. For the following reasons, the NJTCA immunity provisions are not applicable in the present matter, and Plaintiff has stated a claim for negligence and IIED, but not for abuse of process/authority.

#### 1. Immunity

New Jersey state law pursuant to the NJTCA limits the circumstances in which state officials and state entities can be held liable under state law. N.J.S.A. 59:1–1 to 12–3. Moving Defendants have asserted that the alleged conduct at issue is shielded from liability under state law by the NJTCA. Specifically, Moving Defendants argue that, pursuant to N.J.S.A. 59:6–5 and

---

[6] Plaintiff's state common law civil conspiracy claim is also dismissed for the same reasons. The elements of a civil conspiracy under New Jersey law are "two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Mercedes–Benz USA, LLC v. ATX Group, Inc.*, No. 08–3529, 2010 WL 3283544, at *12 (D.N.J. 2010) (quoting *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005)). Here, Plaintiff has not alleged the existence of an agreement by even circumstantial evidence, such as through "the close association and frequent communication between the major players and the pattern of conduct among all of them." *Bd. of Educ., Asbury Park v. Hoek*, 38 N.J. 213, 239 (1962).

[7] As already discussed, Plaintiff's civil conspiracy claim under New Jersey law is dismissed.

6–6, they are immune for failing to diagnose a mental condition, and for any decision to confine a person for mental illness. Those sections provide:

> a. Neither a public entity nor a public employee is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or is a drug dependent person or from failing to prescribe for mental illness or drug dependence; provided, however, that nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for mental illness or drug dependence from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing.
> b. Nothing in subsection a. exonerates a public entity or a public employee from liability for injury proximately caused by a negligent or wrongful act or omission in administering any treatment prescribed for mental illness or drug dependence.

N.J.S.A. 59–6–5.

> Neither a public entity nor a public employee is liable for any injury resulting from determining in accordance with any applicable enactment: (1) whether to confine a person for mental illness or drug dependence; (2) the terms and conditions of confinement for mental illness or drug dependence; (3) whether to parole, grant a leave of absence to, or release a person from confinement for mental illness or drug dependence.

N.J.S.A. 59:6–6.

Courts interpret these provisions broadly, and close calls in application are resolved in favor of immunity, not liability. *See, e.g., Charpentier v. Godsil,* 937 F.2d 859, 865 (3d Cir.1991); *Greenway Dev. Co. v. Bor. of Paramus,* 163 N.J. 546, 552 (2000); *Ludlow v. City of Clifton,* 305 N.J.Super. 308, 311 (N.J. App. Div. 1997); *Perona v. Twp. of Mullica,* 270 N.J.Super. 19, 27 (N.J. App. Div. 1994). These provisions reflect and advance New Jersey's public policy in favor of providing immunity to public employees for their discretionary decision making. *Perona,* 270 N.J.Super. at 27.

The New Jersey Appellate Division has stated that the immunity conferred by N.J.S.A. 59:6–6 is not limited only to confinement within a "mental institution," and that the linchpin for

such immunity "is a discretionary decision whether to confine a person for the care and treatment of mental illness rather than the particular type of facility in which a person may be confined." *Ludlow,* 305 N.J.Super. at 311. Immunity is also not limited to physicians and can apply to any public employee, including police officers. *Perona,* 270 N.J.Super. at 27.

Before the case was transferred to me, Judge Little initially granted Officer Dimler immunity under N.J.S.A. 59:6–6 because she construed Plaintiff's claims as relating to Defendants' "alleged failure to properly confine the decedent based on his mental illness and substance abuse under N.J.S.A. 59:6–6." *Mullin v. Balicki,* No. 11-247, 2013 WL 5935998, at *8 (D.N.J. Nov. 1, 2013). The court ruled that the "decision before Movants was whether to further confine the decedent from the general prison population as a result of potential mental-health issues. Movants decided against such confinement, and therefore, their decision is one considering 'whether to confine a person for mental illness or drug dependence.'" *Id.* at *9 (quoting N.J.S.A. 59:6–6).

Now, however, Plaintiff no longer pleads that there was negligence in the housing placement, *i.e.* that Robert was improperly released into the general prison population. This is not a case, as in those where the immunity provisions have applied, where there was misfeasance regarding where to confine Robert, how to diagnose or treat him, or whether to change the terms of confinement. Rather, the gravamen of the TAC is that the Moving Defendants knew of Roberts' vulnerability to suicide; that Robert was in fact housed appropriately, but Moving Defendants failed to follow standards, protocols, and policies in connection with monitoring Robert and denied him medical care when requested. The Act provides immunity in all circumstances for injury resulting from the failure to diagnose or prescribe, but provides no

immunity for injury resulting from a failure of treatment, as is the case here. *Charpentier,* 937 F.2d at 864.[8]

In *Estate of Wilson v. N. State Prison*, for instance, the defendant prison officials attempted to assert NJTCA immunity in similar circumstances against the estate of an inmate who had committed suicide while incarcerated. No. 07-1942, 2008 WL 2478377 (D.N.J. June 18, 2008). In finding the immunities did not apply, the court concluded that that [the decedent]

> had already been diagnosed as a suicide risk, having been placed on suicide watch on at least two occasions prior to his death, and that Wilson had been evaluated by NSP physicians, psychiatrists, and/or nurses. These medical personnel are alleged to have failed to properly treat, medicate, and/or diagnose Wilson's medical and mental health condition during their treatment or examination of Wilson. The subsequent denials of medical care and treatment by the Moving Defendants are also alleged to have contributed to his death.

*Id.* at ¶ 5. Here, Plaintiff alleges that Plaintiff had already been evaluated by medical personnel upon intake and placed on a Special Needs Roster, requiring a heightened level of supervision. Thus, "it is logical for the Court to infer from these allegations that the defendants had already identified [Robert] with a medical or mental health condition of sufficient severity as to require suicide monitoring, and that there were medical diagnoses and/or examinations related to his medical and mental health condition." *Id.* NJTCA immunity, is, therefore, inapplicable to Plaintiff's state law claims.

---

[8] The TAC does allege that Moving Defendants denied Plaintiff access to a psychiatrist, in violation of the Policy. However, the basis for Plaintiff's vulnerability to suicide claims is not that the lack of a psychiatric evaluation resulted in a misdiagnosis that Plaintiff was not a suicide risk, which would likely confer immunity to Moving Defendants; rather, Plaintiff alleges that he had already been identified as a suicide risk who required heightened monitoring, but did not receive it.

2. <u>Negligence</u>

Plaintiff argues that both sets of Moving Defendants were negligent in their actions or inactions that led to Robert's suicide. "'[T]o sustain a common law cause of action in negligence' under New Jersey law, 'a plaintiff must prove four core elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.'" *Aymonier v. U.S.,* 432 F.App'x 66, 67 (3d Cir. 2011) (quoting *Polzo v. Cnty of Essex,* 196 N.J. 569, 584 (2008)).

Here, Plaintiff has alleged that Officer Defendants had a duty, pursuant to NJDOC policy, to monitor Robert, a known suicide risk; they breached this duty by failing to monitor Robert; and that the failure to monitor Robert resulted in him committing suicide. These allegations are sufficient at this stage to state a claim for negligence: in finding already that Officer Defendants were recklessly or deliberately indifferent to Robert's "strong likelihood" of suicide, I necessarily determined that Officer Defendants' culpability was "something beyond mere negligence." *Palakovic*, 854 F.3d at 222 (citing *Colburn II,* 946 F.2d at 1024–25); *Hearns v. Johnson*, No. 16-3284, 2016 WL 4690386, at *7 (D.N.J. Sept. 6, 2016) ("[O]fficials at the jail clearly did owe Plaintiff a duty of care to the extent that they were required to provide him adequate medical care"). Although I dismissed Plaintiff's Eighth Amendment claims against Supervisor Defendants due to qualified immunity, in doing so I merely found that they had not been recklessly or deliberately indifferent to Robert's rights, a level of culpability higher than negligence. Supervisor Defendants have offered no argument as to why the failure to ensure that Officer Defendants were monitoring Plaintiff did not amount to mere negligence, and, moreover, it is plausible, at the motion to dismiss stage, that Supervisor Defendants had a duty to ensure

that proper monitoring was occurring but failed to do so, which resulted in Robert's suicide. As such, Plaintiff has sufficiently stated a claim for negligence against both Officer and Supervisor Defendants.

### 3. Emotional Distress

The TAC asserts a cause of action for "emotional distress." In her opposition papers, Plaintiff clarifies that the claim refers to an IIED claim against Officer Russo. To state a claim for intentional infliction of emotional distress, a party must plead "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Taylor v. Metzger*, 152 N.J. 490, 509 (1998) (citation omitted). New Jersey sets a "high bar" for a plaintiff to establish extreme and outrageous conduct. *See Taveras v. Resorts Int'l Hotel, Inc.*, No. 07-4555, 2008 WL 4372791, at *6 (D.N.J. Sept. 19, 2008) (citing *Fregara v. Jet Aviation Bus. Jets*, 764 F.Supp. 940, 956 (D.N.J. 1991)). "Only where reasonable persons may differ is it for the jury, subject to the control of the court, to determine whether the conduct alleged in this case is sufficiently extreme and outrageous to warrant liability." *McConnell v. State Farm Mut. Ins. Co.*, 61 F.Supp.2d 356, 363 (D.N.J. 1999) (internal quotation marks omitted).

Here, Plaintiff alleges that Officer Russo engaged in intentional and outrageous conduct by repeatedly telling Robert, who was allegedly openly suicidal, to kill himself. These statements included telling Robert to "go ahead and hang yourself"; to "Shut up. You might as well kill yourself"; and that "there was no psych available" so "I guess you have to kill yourself." TAC at ¶¶ 54-60. These alleged statements, which immediately preceded Robert's suicide by hanging, are, at the very least, such that reasonable persons might differ as to whether they are sufficiently extreme and outrageous to warrant liability. *See McDonald-Witherspoon v. City of Philadelphia*,

No. 17-1914, 2018 WL 4030702, at *13 (E.D. Pa. Aug. 23, 2018) (denying motion to dismiss in prison suicide case, because "[a]t this early stage of the litigation we conclude that these allegations plausibly demonstrate that MHM engaged in extreme or outrageous conduct" because jail "intentionally abdicated its responsibilities for Jones's psychiatric care…. with full knowledge of the danger it posed to him").

    4. <u>Abuse of Process/Abuse of Authority</u>

    Although the TAC asserts a cause of action for abuse of process/abuse of authority, Plaintiff, in her opposition papers, specifically states that she brings Count V as a tort of abuse of authority "separate and apart from a constitutional violation." ECF No. 294 at 38. Contrary to Plaintiff's assertion, no such cause of action exists under the law. *See Mitchell v. Walters*, No. 10-1061, 2010 WL 3614210, at *5 (D.N.J. Sept. 8, 2010) ("The Court is frankly at a loss to construe Plaintiff's 'abuse of authority' assertion as any claim cognizable in the law."); *see also Brunson v. New Jersey*, No. 17-04577, 2018 WL 3388303, at *3 (D.N.J. July 12, 2018) (dismissing abuse of authority claim). Plaintiff's reliance on the phrase "abuse of municipal power and authority" in *Hyland v. Borough of Allenhurt*, 78 N.J. 190, 196 (N.J. 1978) is misplaced. The New Jersey Supreme Court, in that case, did not in fact find that such a tort existed, and it did not otherwise apply tort law. Rather, the Court used the language to explain its ruling that the Borough of Allenhurst could not deprive users of a public beach from adjacent public toilets. *Id.* The case simply does not have any application to the instant matter.

    Thus, Plaintiff's claim for abuse of authority is dismissed.

**IV. <u>CONCLUSION</u>**

For the foregoing reasons, Moving Defendants' motion to dismiss the TAC is **DENIED** as to Counts, I, II, III, and IV, except it is **GRANTED** insofar as Counts I and II are asserted against Supervisor Defendants. The motion to dismiss is also **GRANTED** as to Counts V and VII, which are dismissed as to all Moving Defendants.


Dated: May 31, 2019                                    /s/ Freda L. Wolfson
                                                       Hon. Freda L. Wolfson
                                                       Chief United States District Judge